MONROE W. BEATTY AND PEGGY BEATTY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 997–64. Filed September 30, 1966.

*Robert M. Sweet*, for the petitioners.
*Arthur P. Generaux, Jr.*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in the Federal income tax of petitioners for the taxable year 1961 in the amount of $12,948.49.

The sole issue for our determination is whether petitioners were entitled to deduct the cost of an on-sale retailer's liquor license as a loss under section 165(a) [1] as a result of the amendment of the statute under which the license had been issued. [2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Monroe W. Beatty and Peggy Beatty, the petitioners herein, are husband and wife residing in Yuma, Ariz. They filed a joint Federal income tax return for the calendar year 1961 with the district director of internal revenue, Phoenix, Ariz.

In 1959, petitioners purchased from one Gianopolis for $25,000 an on-sale retailer's liquor license (commonly referred to as a Number Six license) which had originally been issued by the State of Arizona pursuant to section 4–209 (B) (6) of the Arizona Revised Statutes. Prior to the purchase of the license by petitioners, it had not been used in the operation of a business for approximately 2 years.

Petitioners purchased the license both for the purpose of engaging in the liquor business and as an investment. [3]

Monroe's principal source of income was a general machine and welding business. In addition, petitioners owned warehouses and buildings, in one of which was located a tavern at the time they purchased the license. The tavern had been operated by Dot and Al Alcox under a leased license. Petitioners took over the operation of this tavern, renaming it the Palomino Pony Bar and using the license that they had purchased. Petitioners have continued to operate the tavern renewing their license annually from 1959 to the date of the trial.

Arizona liquor licenses were issued on an annual basis, expiring on December 31 of each year. Holders of the licenses could renew them annually upon payment of a renewal fee.

During the decade 1950 to 1960, Number Six licenses were issued under a quota system for each county, which was based on the last census taken. As a result of the large growth in the population of Arizona and the limitations on the number of licenses that could be issued, the value of Number Six licenses increased. The holder of a

---

[1] All references are to the Internal Revenue Code of 1954.

[2] Should the issue be decided in favor of respondent, there is also involved in the deficiency a corresponding adjustment of petitioners' medical deductions. Petitioners do not dispute the computation of respondent in this regard.

[3] The evidence shows that if petitioners had not desired to "invest" in a license, they could have rented one for use in their business.

Number Six license was not required to use it in a business and it could be transferred freely from person to person, as well as leased to operating businesses, upon approval of the Arizona Department of Liquor Licenses and Control. In the case of transfer, a transfer fee was payable. The described situation encouraged the practice of holding the licenses for investment purposes.

In July 1961, Arizona Governor Paul J. Fannin convened the State legislature in special session. In a message to the legislature, Governor Fannin stated the following in support of legislation regulating the issuance and transfer of liquor licenses:

> I issued the call of this special session in answer to a clear mandate from our people for straightforward action to end uncontrolled speculation in liquor licenses * * *.
>
> *    *    *    *    *    *    *
>
> The people of Arizona emphatically reject the false notion that their state government has the slightest legal or moral obligation to insure profit for liquor license speculators. We should not perpetuate a pattern of speculative trafficking in mere permits granted by the state for the sale of alcoholic beverages.
>
> Nor do the people of Arizona accept a situation wherein an original permittee, by the renting or leasing of one or more permits to others, is in effect endowed by our state government with an unearned income.

One of the Governor's proposed revisions was that:

> 1. All sales, leases, rentals or transfers of ownership of alcoholic beverage licenses should be prohibited, regardless of date of issuance. * * *

The applicable Arizona statutes regarding liquor licenses were then amended by the State legislature in July 1961.[4] As amended, the statutes provided that a license could not be assigned, transferred, or sold unless the transfer of the license was part of a bona fide bulk sale of the entire business and stock in trade. A license could not be leased, but a lessee of a license existing on the effective date of the amendment was entitled to have a license issued to him. Any license was to revert to the State if inactive for 6 months. The 1961 amendments further provided that a license for the sale of liquor to be consumed on the premises could be issued to any hotel, motel, or restaurant in which meals were served. These licenses were not to be considered in determining the number of licenses permitted by the quota system in any county.

The 1961 amendments also authorized the issuance of additional Number Six licenses. For each year 1962 through 1970, all counties would be permitted to issue additional licenses up to 10 percent of the number of licenses outstanding on December 31, 1961.

As a result of the 1961 amendments, Number Six licenses decreased greatly in value.

---

[4] The amendments applicable to the instant case were effective Oct. 31, 1961.

The approximate gross amount of petitioners' sales and net profit or loss for the years 1961 through 1964, inclusive, were approximately as follows:

| Year | Amount | Profit (or loss) |
|---|---|---|
| 1961 | $34,000 | ($3,600) |
| 1962 | 40,000 | 2,700 |
| 1963 [1] | 50,800 | ( 4,000) |
| 1964 | 59,900 | ( 7,000) |

[1] Petitioner began selling food on the premises in 1963, but the record does not disclose any allocation between food and liquor sales.

Since the 1961 amendment, there have been transfers of Number Six licenses through bulk sales of entire businesses.

### OPINION

Petitioners seek to justify under section 165(a)[5] their claimed loss in 1961 of $25,000 as representing the "worthlessness of liquor license purchased."

It is well settled that a loss must be evidenced by a completed and closed transaction. E.g., *United States* v. *White Dental Co.*, 274 U.S. 398 (1927); *A. J. Schwarzler Co.*, 3 B.T.A. 535 (1926). Mere diminution in value does not qualify. *United States* v. *White Dental Co.*, *supra; Pugh* v. *Commissioner*, 49 F. 2d 76 (C.A. 5, 1931), affirming 17 B.T.A. 429, certiorari denied 284 U.S. 642; *White Star Line*, 20 B.T.A. 111 (1930).

Petitioners contend that the liquor license was dichotomous in nature with valuable property rights existing "separate and apart" from the mere license to do business. They assert further that it was these rights rather than the permit to do business for which they paid the $25,000 and that the 1961 amendments to the Arizona statutes caused these rights to become "worthless," thereby evidencing a "closed transaction" insofar as these rights were concerned.

Respondent, on the other hand, argues that, for tax purposes, there is no dichotomy, that petitioners bought the license in its totality, and that subsequent to December 31, 1961, they were still using it in their business.[6] Therefore, he asserts that there was no closed trans-

---

[5] SEC. 165. LOSSES.

(a) General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

[6] Respondent notes petitioners' increased liquor sales during the period 1961–64 and argues that the license itself had not depreciated in value in spite of the increased competition brought about by the amendment of the liquor laws. In this connection, we are constrained to point out that the net profit or loss figures are not particularly meaningful, since petitioners commenced selling food at the Palomino Pony Bar in 1963 and there were apparently sizable purchases of equipment which gave rise to large amounts of depreciation and the bases for determining profit or loss were not explained. Even accepting petitioners' figures at face value, the business showed a net profit in 1962, as against a loss in 1961, the year of the loss claimed herein.

action, but a mere diminution in value, and that consequently petitioners are not entitled to their claimed deduction. We agree with respondent.

The crux of petitioners' argument is that prior to the 1961 amendments there was a quota on Number Six licenses which had long been filled in petitioners' county; that the licenses were freely transferable from person to person and were renewable annually by the holders of the licenses; that there was no requirement that the owners or holders of such licenses actually engage in the business of selling liquor; and that, as a result, there had been a steady increase in the value of the licenses which owners could reasonably expect to continue.

Then in 1961 Governor Fannin asked for and received legislation designed to curb speculative trafficking in liquor licenses. Under the new law, because of the granting of new licenses to hotels, motels, and restaurants without reference to the quota and, in addition, the 10 percent per year increase in the quota of licenses issued to others, there was no practical limit, according to petitioners, to the licenses that could be issued in and around petitioners' county. Also, holders of licenses had to use them in their businesses to retain them and could not transfer them to another without a bulk sale of their entire liquor business. As a result, licenses decreased greatly in value. Although petitioners could still use the license in their business, they insist that they lost valuable property rights to the license, which were separable from the mere right to do business and for which they had paid $25,000.

Petitioners cite four Arizona decisions as their authority that a "liquor license embodies valuable property rights *separate and apart* from the mere license to do business" (pet. br. 12, emphasis added): *Hooper* v. *Duncan*, 95 Ariz. 305, 389 P. 2d 706 (1964); *Siler* v. *Superior Court*, 83 Ariz. 49, 316 P. 2d 296 (1957); *Duncan* v. *Truman*, 74 Ariz. 328, 248 P. 2d 879 (1952); *Hom Moon Jung* v. *Soo*, 64 Ariz. 216, 167 P. 2d 929 (1946). We consider these cases merely as authority for the proposition that against third parties (other than the State) a license is an enforceable property right with a peculiar and special value, but against the State a license is merely a permit granted by the sovereign to carry on business subject to regulation and modification under its police power. Even if we were to consider that local law controlled the determination of petitioners' right to a deduction, we think that these decisions merely make a dichotomy as to the persons against whom the holder of a license is asserting his rights and not as to the license itself. In any event, even if they might be considered as holding the license itself to be dichotomous in nature, they certainly do not stand for the proposition that such divisibility applies in all cases.

Petitioners rely heavily on *William Zakon*, 7 B.T.A. 687 (1927), and in particular the following language from the opinion therein (p. 689) : "the holder of such a license [liquor] had an asset which had a *value* entirely separate and distinct from the right to conduct the business of a liquor dealer." (Emphasis supplied.) We do not question petitioners' assertion that the right freely to transfer their license had a *value* separate and distinct from their right to carry on the liquor business. But it does not follow that, because each of petitioners' "bundle of rights" may have a separate and distinct value, *the rights themselves* are severable so as to give rise to a deductible loss if one of them becomes worthless. We note also that *Zakon* was one of several prohibition cases [7] where *all* of the taxpayer's rights were destroyed. See *Consolidated Freight Lines, Inc.*, 37 B.T.A. 576, 581 (1938), affd. 101 F. 2d 813 (C.A. 9, 1939).

We think the instant case falls within the ambit of *Reporter Publishing Co.*, 18 T.C. 86 (1952), affd. 201 F. 2d 743 (C.A. 10, 1953), certiorari denied 345 U.S. 993, and *Consolidated Freight Lines, Inc., supra*. In the former case, the taxpayer had purchased the exclusive right to Associated Press services in its community. Subsequently, the Supreme Court of the United States, in *Associated Press* v. *United States*, 326 U.S. 1 (1945), found that the exclusive rights to membership constituted restraints of trade and were therefore illegal. The taxpayer claimed a loss on the ground that its membership thereby became totally worthless and that therefore there was a completed transaction for tax purposes. We held that, although the loss of the right to exclusive Associated Press services probably impaired the taxpayer's franchise, continued use of the services by the taxpayer negated any claim of worthlessness. The same result was reached in *New York Sun, Inc.*, 27 T.C. 319 (1956), affirmed per curiam 253 F. 2d 487 (C.A. 2, 1958), and *Independent Publishing Co.* v. *Commissioner*, 238 F. 2d 238 (C.A. 4, 1956), affirming per curiam a Memorandum Opinion of this Court.

Similarly, in *Consolidated Freight Lines, Inc., supra*, the taxpayer, a motor transport company, had acquired at considerable cost a certificate of necessity, which was a prerequisite for entering business under a State statute conferring monopolistic rights upon the certificate holder. Subsequent legislation removed the monopolistic character of the certificates. The taxpayer claimed a deductible loss for 1934, the year the legislation became effective, on the grounds that the taxpayer had paid valuable consideration for the monopolistic rights and that the destruction of those rights resulted in a deductible loss. We held that the monopolistic character of the certificate was

---

[7] *Burnet* v. *Niagara Falls Brewing Co.*, 282 U.S. 648 (1931) ; *Elston Co.* v. *United States*, 21 F. Supp. 267 (Ct. Cl. 1938) ; *Best Brewery Co.*, 16 B.T.A. 1354 (1929) ; *McAvoy Company*, 10 B.T.A. 1017 (1928).

not shown to be separate and apart from the right to carry on business, that the fact that the taxpayer continued to use the certificate in its business meant that there was no closed transaction, and that, therefore, no deductible loss was incurred.

Petitioners seek comfort from the following language in *Consolidated Freight Lines, Inc.*:

The monopolistic character of the certificates is not, as far as the record shows, a thing separate and apart from the right to carry on a business under them. In other words, there is no showing that the certificates were bought and sold like shares of stock or bonds which are so often held by the owner for income or appreciation without thought of his engaging in the business that gives value to the securities. * * * [See 37 B.T.A. 576, 580–581.]

Petitioners claim that, prior to 1961, liquor licenses were sold like shares of stock or bonds and that many investors did not buy with intent to, and did not in fact, engage in the liquor business. Even if we assume the correctness of petitioners' assertion, they cannot prevail. In this case, petitioners not only had thoughts of engaging in the liquor business when they acquired the license but they thereafter actually carried on such a business. Consequently, it does not follow that, because a pure investor in a Number Six license might be treated differently (an issue which we do not decide), petitioners would be entitled to the same treatment. Cf. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955).

Prior to the 1961 amendments, petitioners' license had three elements—the right of free transfer, the right to lease, and the right to use in the liquor business. After the 1961 amendments, the right of transfer could still be exercised, albeit only in connection with a bulk sale of the entire business and stock in trade. The right to lease was eliminated. The right to use the license in the liquor business continued, perhaps in a somewhat weakened state, because of the increase in the number of licenses potentially allowable.

The 1961 amendments debased the *value* of, but did not destroy, any of these rights, with the exception of the right of lease (which petitioners have not put in issue). Whatever may be the quality of severability of rights of ownership in other situations (cf. Rev. Rul. 54–409, 1954–2 C.B. 174), we are not prepared to *sever these rights* from each other nor to herniate the right of sale and hold the hernia irreparable, as petitioners would have us do. We take as our text what we said in *Louisiana Land & Exploration Co.*, 7 T.C. 507, 518 (1946), affd. 161 F. 2d 842 (C.A. 5, 1947):

We can * * * foresee innumerable administrative difficulties as a consequence of allowing a taxpayer, upon showing that an asset owned by him is valueless for one of several purposes for which it was acquired, to deduct the part of the purchase price which might be apportioned to that purpose. Moreover, to permit such a deduction would be to allow the taxpayer to make one asset into as many as

there were contemplated uses for it, and would have the effect in many cases of nullifying the established rule that mere shrinkage in the value of an asset prior to closing of the transaction with respect thereto does not give rise to a deductible loss. See *Edith K. Findley*, 46 B.T.A. 1219. The approval of petitioner's contention would thus, in our view, constitute the adoption of a principle which is in conflict with the correct and long established interpretation of the loss provisions of the code and would lead to confusion in their administration.

We hold that there was no closed transaction in 1961 so as to support the claimed deduction. Petitioners' loss, if any, must abide further events.[8]

*Decision will be entered for the respondent.*

---

[8] We note that, even if the petitioners' various rights were held to be separable, we would be unable to determine how much of the $25,000 paid for the license should be allocated to each right. Cf. *Consolidated Freight Lines, Inc.*, 37 B.T.A. 576, 582.