Stanley Selig and Dona Selig v. Commissioner.
Selig v. Commissioner
Docket No. 3963-64.
United States Tax Court
T.C. Memo 1967-253; 1967 Tax Ct. Memo LEXIS 8; 26 T.C.M. (CCH) 1302; T.C.M. (RIA) 67253; December 22, 1967
Stanley Selig, pro se. 42 West South St., Indianapolis, Ind., Wayne I. Chertow, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1960 and 1961 in the following amounts: 1960
$ 4,516.68
1961
7,109.67
Total
$11,626.35
The issues are whether certain alleged payments claimed as cash basis expenses in connection with a Brazilian land venture in 1960 and 1961 were actually paid, and if so, whether they were properly deductible in those years. A minor, and apparently abandoned issue, is *9 whether deductions for gasoline taxes and automobile license fees in the years 1960 and 1961 were excessive. Findings of Fact Stanley and Dona Selig are husband and wife. Their legal residence at the time of filing the petition herein was Indianapolis, Indiana. They filed joint individual income tax returns for the years 1960 and 1961 with the district director of internal revenue, Indianapolis, Indiana. Dona is a party to this litigation solely because she filed joint returns with her husband. Consequently, we will refer to Stanley as the petitioner. No stipulation of facts has been filed; however, at trial and on brief several concessions were made. These will be reflected in the Rule 50 computation. Petitioner was in the real estate business at relevant times, operating a proprietorship under the name of Selig Brothers Real Estate. Although the petitioner had no partners, he had an associate. Arpad Szuecs, who acted as his agent in Brazil and performed services for him in connection with land located there. In about 1957 or 1958 Szuecs suggested to the petitioner the idea of buying and profitably reselling Brazilian real estate, and in 1958 petitioner first purchased farm *10 land there in an area one hundred to four hundred miles north of the city of Brasilia. During 1960 and 1961 petitioner's Brazilian holdings totaled about 200,000 acres. At the time of trial he owned between two and one-half and three million acres of Brazilian land. The 200,000 acres which the petitioner owned during the 1960-1961 period was composed of the following noncontiguous tracts in Petropolis de Brasilia which is located about 100 miles north of Brasilia: 20,000
acres in State of Mato Grosso
(Fawcetland)
33,000
acres in Sitios Colorado
6,500
acres in Sitios Florida
9,500
acres in State of Goias
129,000
acres in Sitios Portland In addition, the petitioner's son owned a 30,000 acre tract located about 300 miles north of Brasilia. The 20,000 acre tract in the State of Mato Grosso was cultivatable and was named "Fawcetland" by petitioner. Of this tract the 2,500 acres closest to a river was designated "City of Fawcet" by the petitioner and he had it staked out into 20,000 residential lots. The remainder was staked out into 151 farms of about 100 acres each. At no time did the City of Fawcet develop beyond the plotting and staking-out stage. The *11 record, which is far from clear, indicates that petitioner was unable to satisfy Brazilian fiscal regulations as to prospective urban developments. In any event, required governmental sanction for petitioner to develop the city was withheld or withdrawn, and all moneys which had been collected from an insignificant number of Fawcetland sales were refunded to the purchasers. Petitioner still owns all of Fawcetland and continues to pay real estate taxes on it. Petitioner commenced his development efforts as to the city of Fawcet in about 1960. By 1961 the project was abandoned as useless for anything other than farming. All hopes of developing a city with adjoining 150 acre farms were abandoned in that year. The petitioner spent the following amounts advertising and promoting his and his son's land in Brazil. Only 80 percent of each of the expenditures detailed below is properly attributable to his own lands: A.
Year
Amount
To
For
1960
$ 12.80
AAAA Advertising Agency
Services in Placing
Advertising
1960
168.00
The Masonic Chronicle
Advertising
1960
96.32
Houston Chronicle
Advertising
B. As part of his promotional effort, *12 the petitioner bought back issues of several magazines which had stories in them describing Brazil. These were shown to prospective customers. Such purchases are listed below: Year
Amount
Purchased From
1960
$ 8.00
L. A. Times
1960
25.50
National Georgraphic
1960
$25.00
Time
1960
20.00
National Georgraphic
C. The petitioner had maps, blue prints, and photographs made, all in connection with sales promotion. The amounts spent in obtaining these documents were: Year
Amount
To
For
1960
$ 37.60
Hayes Printing
Blue Prints
1960
78.64
Indianapolis Blue Print
Maps
1960
288.46
Cooper Studios
Photo Finishing
D. An important part of the petitioner's sales effort was embodied in a multicolored brochure which gave general background information about Brazil and then described the various lands which he and his son had for sale there. Among the tracts specifically referred to were the following: Petropolis de Brasilia - City of Fawcetland - 2,500 acres, 9,500 acre tract, 6,500 acre tract, 33,000 acre tract, 30,000 acre tract (petitioner's son's land) This brochure was prepared and paid for in 1960 at a total cost of *13 $950. E. On his 1960 return the petitioner claimed a deduction for $495.01 for liquor allegedly purchased to entertain customers. Of this amount $100 was an ordinary and necessary expense incurred during 1960 in promoting petitioner's and his son's real estate ventures. F. During 1961 petitioner made payments of $6,194.84 and $982.50 to Arpad Szuecs for advertising materials, deed forms, plats, etc., which were to be used in selling land in virtually all of petitioner's Brazilian holdings and his son's 30,000 acre tract. From the record we find petitioner's direct development expenses were as follows: 1. During 1960, the petitioner paid $12,000 to Arpad Szuecs. This sum was paid for surveying, laying out plots, obtaining engineering permits, and clearing titles in the development of Fawcetland. A substantial portion of this sum was spent in staking out farms in Fawcetland, and lots in the City of Fawcet. 2. In 1961 an airstrip was constructed at Fawcetland at a cost of $400, and engineering, planning, and layout work totaling $10,111 was paid for in 1961 (January 1961, $4,600 and October 1961, $5,511). An additional $150 was spent by petitioner in 1961 in recording titles *14 on the 30,000 acre tract which belonged to his son; no part of this expenditure benefited petitioner or his lands. In his 1960 tax return the petitioner deducted the following as "Brazilian Expenses": Hayes Printing
$ 46.25
Barbara Gosnell
3.50
The Miami Herald
5.75
Brighton Clothes
23.75
Jesse Love
7.00
Dorothy Goodrich
8.79
Hayes Printing
71.70
Hess Duplicator
7.50
Total
$174.24
Although the above payments were made, we were unable to find from the record that they were related to petitioner's Brazilian land ventures. In 1961 petitioner deducted the following as "Brazil Expenses": Hotel Normandy
$ 45.00
Brasilia Place Hotel
331.01
El Panama Hilton
37.40
U.S. Treasurer Passport
Agency
8.08
AOPA Pilot
591.05
Wall Street Journal
95.20
Total
$1,107.74 We are unable to find that these expenditures were ever made. None of the concessions of either party relate to the above-detailed items which we have placed in what seem to be obvious classifications. Respondent's deficiency notice disallowed them as not substantiated as to payment, not substantiated as being ordinary and necessary business expenses under section 162, *15 [1] and (as to items properly to be capitalized) not substantiated as to any abandonment. Opinion The entire amount of each year's determined deficiency is disputed in the petition, however, there was no further mention at trial or on brief of the issue concerning the deductibility of gasoline taxes and automobile licenses for either 1960 or 1961. We therefore hold that the petitioners have failed to carry their burden of proof, and the respondent's determinations as to this issue are upheld. The petitioner's oral testimony, together with the canceled checks and other records which he introduced has persuaded us that some of the items which respondent disallowed were actually paid, were directly concerned, connected with, and necessary to petitioner's efforts to promote, advertise and advantageously sell his Brazilian lands, and, in view of the character and enormous size of this venture, that they were reasonable and ordinary expenses of petitioner's real estate business. We have listed and described these properly deductible items as advertising and promoting expenses in subparagraphs *16 A. through F. of our Findings of Fact. The large amounts of money spent for some of these items (particularly those listed in said subparagraph F.) indicate that they would not be consumed in the year of purchase, but would be useful until much of the property had been sold. But this does not change the essential character of such items. Their cost is still clearly a selling expense, deductible when paid. Consolidated Apparel Co., 17 T.C. 1570, acq. as to this issue 1952-2 C.B. 1; New Jersey Bergen Square Realty Corporation, 22 B.T.A. 1324; F. E. Booth Co., 21 B.T.A. 148. However, as indicated in our findings, this advertising and sales promotion was for both the petitioner's and his son's lands, so an allocation is necessary. The petitioner has made none, consequently we have exercised our best judgment, bearing heavily against the petitioner for his failure to separate out his own expenses, and we hold that only 80 percent of the said expenditures (subparagraphs A. through F.) are attributable to the petitioner's lands and deductible by him. Cohan v. Commissioner, 39 F. 2d 540. We have also used the Cohan *17 rule to allow only $100 ( $80 deductible by petitioner) of the claimed $495.01 liquor item (subparagraph E., supra). Petitioner produced no records to substantiate his testimony on this item. We found his testimony weak on this item, but we believe that he did use some liquor in business entertaining in connection with this venture and we have exercised our best judgment. Turning now to petitioner's Fawcetland expenditures which we have found were in fact made, but which we have characterized as development expenses in subparagraphs 1 and 2 of our Findings of Fact, it is clear that these items must be capitalized and added to petitioner's basis in the requisite tract and that they were not deductible as current expenses. The amounts spent by petitioner in surveying and clearing his titles and in constructing the Fawcetland airstrip were so clearly capital expenditures as to make any further discussion of them unwarranted. The remainder of such items were amounts spent for engineering permits, engineering planning, layout work and the actual laying out or staking the boundaries of prospective farms and city lots in Fawcetland and the city of Fawcet. All of these *18 activities were obviously in connection with petitioner's development of this property to the use which he envisaged for it. He didn't intend or expect the results produced by his money and efforts to be used up and exhausted within a year, or ever. They were designed and conceived to develop and improve the property to a higher and better character - thus increasing petitioner's margin of profit on every sale he was able to make. We see no meaningful distinctions between these development expenses and the "use survey" involved in Godfrey v. Commissioner, 335 F. 2d 82 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court, certiorari denied 379 U.S. 966 (1965). There the taxpayer had purchased a share in lands known as Goose Pond and had caused a survey to be conducted to determine the best commercial use of the property. It was later found that such use, so determined, would require a rezoning of the property, but taxpayer's efforts to rezone were unsuccessful. In denying expense treatment for the cost of the survey, the Circuit Court said (p. 85): The *19 test of an ordinary business expense is whether it is of a recurring nature and its benefit is generally exhausted within a year. An expenditure is of a capital nature "where it results in the taxpayer's acquisition or retention of a capital asset, or in the improvement or development of a capital asset in such a way that the benefit of the expenditure is enjoyed over a comparatively lengthy period of business operation." [cites omitted] In Godfrey, as in the instant case, the attempts at improving the land were unsuccessful, but this factor does not alter the character of the expenditures nor make them deductible as expense items. As expressed by the Circuit Court in Godfrey: We think there can be no distinction. The purpose of the expenditure was to create a permanent benefit. The fact that it created neither a permanent nor exhaustible benefit does not change its character. Louisiana Land & Exploration Co. v. Commissioner, 7 T.C. 507, aff'd 161 F. 2d 842, C.A. 5; Parkersburg Iron & Steel Co. v. Burnet, 48 F. 2d 163, C.A. 4; Galt v. Commissioner, 19 T.C. 892, *20 aff'd 216 F. 2d 41, C.A. 7, cert. den., 348 U.S. 951, 75 S. Ct. 438, 99 L. Ed. 743. Petitioner urges as an alternative that if we hold these expenditures to be of a capital nature (which we do), that they had become worthless and were abandoned by him in 1960 [2] and are therefore deductible by him in that year under section 165. Apparently, from the record, the state government did not object to Selig's selling farm land in the wilderness, but it did object to his representing this land as being in a city which was unlikely to ever be developed. It is not clear what it was that petitioner claims to have abandoned. Nowhere does he claim that the land which was designated City of Fawcet was worthless. Indeed, because when he purchased it the land was, at best, farmland, the fact that he cannot build a city on it would not make it worth substantially *21 less than what he paid for it. Furthermore, petitioner continues to pay tax on the land, and holds it for sale. A letter he received from his associate in Brazil indicates that as soon as they discovered that they could not sell lots in the City of Fawcet that they went about having it rezoned to farmland. Nothing indicates that even after the decree the land was worth less than petitioner paid for it. On these facts, we hold that petitioner has not shown abandonment. In order to establish his right to a deduction under section 165 the petitioner need not enter into a sale or exchange; it is enough for him to show that even though he retains legal title the land has lost all useful value to him or has become worthless. Section 1.165-2(a), Income Tax Regs. However, where, as here, there has been no showing that the land is either worthless or without useful value to the petitioner, there has been no abandonment. As we said in Stanley Burke, 32 T.C. 775, at 779-780, affd. 283 F. 2d 487 (C.A. 9, 1960): [In] order for a taxpayer *22 to become entitled to a deduction for a loss of useful value and abandonment, there must be something more than mere diminution in value, nonuse of the property, or contemplation of a writing off of the property as a complete loss. * * * The general rule was stated in Commissioner v. McCarthy, * * * [129 F. 2d 84 (C.A. 7, 1942)] to be as follows: The rule to be deduced from the "abandonment" cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it, which act of abandonment must take place in the year in which the value has actually been extinguished. * * * It appears, however, that the petitioner may not be arguing that the land itself was abandoned, but rather that those capital expenditures which were made in planning the City of Fawcet became worthless when the land had to be converted back to farmland. The *23 petitioner has referred us to no authority for the proposition that part of the cost basis of the land can be abandoned without abandoning the land itself. There can be no deductible loss arising out of a partial abandonment of land. The taxpayer is not free to abandon some shafts of his bundle of rights in the land while retaining others. The taxpayer in Coalinga-Mohawk Oil Co., 25 B.T.A. 261 (1932), affd. 64 F. 2d 262 (C.A. 9, 1933), certiorari denied 290 U.S. 637 (1933), was denied a deduction for the value of mineral rights on land which it had purchased for $80,000 as oil-bearing land but which turned out to be barren of oil and therefore worth only $2,000. We held that there was no closed transaction and that until there was, there could be no deduction for depreciation in value of the property. 25 B.T.A. at 263-264. Similarly in Louisiana Land & Exploration Co., 7 T.C. 507 (1946), affd. 161 F. 2d 842 (C.A. 5, 1947), acq. 1946-2 C.B. 3, we were faced with another case in which the *24 taxpayer sought to deduct as a loss the value of its mineral rights which were shown to have contained no oil. In denying a deduction for the partial worthlessness of the land we said: We can, * * * foresee innumerable administrative difficulties as a consequence of allowing a taxpayer, upon showing that an asset owned by him is valueless for one of several purposes for which it was acquired, to deduct the part of the purchase price which might be apportioned to that purpose. Moreover, to permit such a deduction would be to allow the taxpayer to make one asset into as many as there were contemplated uses for it, and would have the effect in many cases of nullifying the established rule that mere shrinkage in the value of an asset prior to closing of the transaction with respect thereto does not give rise to a deductible loss. * * * [7 T.C. at 518] Accord, Price v. United States, 260 F. Supp. 18 (W. D. Oklahoma 1966); cf. Monroe W. Beatty, 46 T.C. 835 (1966); Citizens Bank of Weston, 28 T.C. 717 (1957), affd. 252 F. 2d 425 (C.A. 4, 1958). Applying these rules to the present case, we hold that the petitioner's *25 abandonment of those improvements to his land which may have become worthless because of a decree of the government of the State of Mato Grosso, Brazil, did not give rise to a deductible loss under section 165. Although the decree made it impossible to sell the land as lots in a planned city it did not prohibit the petitioner from selling it for what it was - farm land in the State of Mato Grosso. The capital expenditures will be reflected whenever the petitioner sells, exchanges, or entirely abandons the land. This brings us finally to the claimed deductions for the $150 paid by petitioner in 1961 in recording titles to his son's land, the 1960 payments totaling $174.24 which we have found were not proved related to petitioner's Brazilian venture, and the claimed 1961 payments totaling $1,107.74 which the record does not substantiate as having been made, all of which we disallow. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise so stated.↩
2. Petitioner argues for both 1960 and 1961 as his year of abandonment. We have found that his development program for Fawcetland was abandoned in 1961, but in view of our holding that there had been no abandonment of the land, the year is unimportant as regards the only deduction issue now before us.↩