CRST, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24725-85.        Filed June 12, 1989.

*Robert E. Konchar* and *J. Scott Bogguss,* for the petitioner.

*Elizabeth G. Beck* and *Mark E. O'Leary,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax liability as follows:

| Year | Deficiency |
| --- | --- |
| 1977 | $94,293 |
| 1978 | 320,775 |
| 1979 | 37,082 |
| 1980 | 477,036 |

After concessions, the sole issue for our consideration is whether petitioner is entitled to deduct the decrease in value of certain Interstate Commerce Commission (ICC) certificates of operating authority, incurred as a result of deregulation, as a section 165[1] abandonment loss.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner, CRST, Inc., is an Iowa corporation whose principal place of business is Cedar Rapids, Iowa. Petitioner has engaged in the motor carrier business continuously since 1953 through the years at issue in this case. Petitioner generally operated in a territory located east of the Missouri River and north of the Mason-Dixon Line.

Petitioner timely filed its U.S. Corporation Income Tax Returns, Forms 1120, for the taxable years 1977, 1978, 1979, and 1980 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioner then filed an Amended U.S. Corporation Income Tax Return, Form 1120X, for the taxable year 1979 on November 13, 1980. Petitioner also filed a U.S. Corporation Application for Tentative Refund, Form 1139, in order to carryback claimed unused tax credits from taxable year 1980 to taxable years 1977 and 1978 on or about July 2, 1981, and a U.S. Corporation Application for Tentative Refund, Form 1139, in order to

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

carryback unused tax credits from taxable year 1981 to taxable year 1978 on or about May 17, 1982, with the Internal Revenue Service Center at Kansas City, Missouri.

The parties stipulated that a statutory notice of deficiency was timely mailed to petitioner on April 12, 1985, determining the above referenced deficiencies for the years 1977, 1978, 1979, and 1980. These deficiencies were based on respondent's disallowance of investment credit carrybacks, research credit carrybacks, and charitable deductions. However, the parties have stipulated that those specific issues are computational in that they are totally dependent upon the resolution of the issues relating to the disallowance of the decrease in value of certain ICC operating authorities as an abandonment loss in the amount of $3,660,929 and the allowance of 60-month amortization of said operating authorities in the amount of $366,093 for petitioner's 1980 tax year.

In order to transport cargoes in the motor carrier business, petitioner is required to obtain ICC approval of both routes used and commodities transported. The ICC grants such approval by issuing certificates of convenience and necessity, otherwise known as certificates of operating authority, operating authority, or simply authorities. The ICC also issues various types of operating authority, including temporary authority, emergency temporary authority, and permanent authority. A permanent authority is valid for a specified time period and requires the full ICC approval process which is described below. An emergency authority can be acquired through a reasonably informal application process and remains valid for 30 days. Temporary authority, which was also available through an expedited approval process, would remain valid for 180 days. If an application for permanent authority was on file with the ICC before a temporary authority expired, the temporary authority would then continue until the ICC issued a final ruling on the permanent authority application.

Before Congress enacted the Motor Carrier Act of 1980, Pub. L. 96-296, 94 Stat. 793, the motor carrier industry was heavily regulated by the ICC. Enacted in 1935, Part II of the Interstate Commerce Act (the 1935 Act) provided the basic framework for regulation of the motor carrier indus-

try. Under the 1935 Act, carriers were obliged to provide nondiscriminatory service at regulated rates for the public convenience and necessity. More importantly, the ICC effected industry regulation by issuing or withholding certificates of operating authority.

Pursuant to the 1935 Act, the ICC granted a limited number of certificates of operating authority. The criteria for the grant of an operating authority from the ICC was a showing that additional services of the type for which the authority was sought was, or would be, required by the public convenience and necessity. Businesses with existing operating authorities could intervene in a proceeding for a request of operating authority to show that the proposed service was not, or would not be, required by the public convenience and necessity.

The right of existing operators to intervene and the applicant's burden of showing that the proposed service was required by the public convenience and necessity—based on the 1935 Act—gave existing operators protection against competition. Because of these roadblocks, persons wishing either to enter the motor carrier business or expand an existing business would often purchase operating authorities. Substantial amounts were paid for these operating authorities. This reflected the protection against competition afforded operating authority owners under ICC administration of the 1935 Act. The value of the operating authorities provided owners with an asset that constituted a substantial part of a carrier's asset structure and often served as a source of loan collateral.

On July 1, 1980, the Act became law. The Act significantly eased the process of obtaining an operating authority from the ICC by requiring that motor carriers need only demonstrate that they are fit, willing, and able to supply the proposed service, and that the service will provide a useful public purpose, responsive to public demand or need. In order to defeat such a licensing application, competing carriers must show that a grant of the application is inconsistent with the public convenience and necessity. The Act thus shifted the burden of proof from the applicant, who previously had to establish a need for the proposed

service, to the protestant who then had to establish that there is no need for additional service.

Under this new statutory scheme, the ICC approves substantial (over 99 percent) numbers of operating authority applications, making the granting of operating authority applications largely a ministerial function. As a result of this deregulation, motor carriers such as petitioner could obtain broad 50-State operating authorities with comparatively little effort. Although the Act provides for a relaxed application approval process, it does not obviate the requirement that a motor carrier obtain an ICC operating authority to conduct interstate motor carrier business. However, nothing in the Act proscribes duplicative overlapping with existing authority, such as those obtained by petitioner under the 1935 Act.

Prior to the effective date of the Act, petitioner acquired hundreds of operating authorities from the ICC, under docket number MC114273, which permitted petitioner to transport by truck and for hire various specified commodities over designated routes in 36 States. Each operating authority was obtained separately, sometimes being purchased from other motor carriers and sometimes by direct application to the ICC. The authorities were often very expensive to obtain because of the need to have these operating authorities for each particular origin or destination point and for each particular commodity carried. It was very difficult, if not impossible, to obtain broad general grants of authority. Virtually all applications for new or expanded authority were vigorously opposed by existing competitors. Petitioner thus incurred substantial legal and administrative costs in obtaining operating authorities.

Each of petitioner's operating authorities is a separate asset, and the cost of obtaining it was capitalized in petitioner's books, with each single operating authority having its own capital account. Petitioner indicated on its 1980 Federal income tax return that the combined bases for the operating authorities that it allegedly abandoned totaled $3,660,929. However, the summary listings of ICC operating authority costs submitted by petitioner at trial indicate a combined total of $3,645,488.25.

The Act had a dramatic deleterious effect upon the value of petitioner's existing operating authorities. The value of petitioner's operating authorities after the Act was severely reduced by the ease of obtaining new operating authorities and the concomitant reduction in legal costs and filing fees associated with the licensing proceedings. Despite this marked decrease in value, a market for the sale of operating authorities still existed. However, due to the eased application process, both the value and volume of such transactions declined dramatically.

On October 9, 1980, petitioner filed an application dated October 7, 1980, with the ICC for an operating authority to transport all commodities between all points in the United States. This new post deregulation national authority was referred to by petitioner as a "Sub 769" authority. Upon approval, the Sub 769 authority alone would effectively satisfy the bulk of petitioner's ICC registration requirements. Approval of that application could not be expected until some time in 1981.

A notice that petitioner had filed the October 9, 1980, application for the Sub 769 was published in the Federal Register on November 4, 1980. Anyone protesting the issuance of this operating authority had until December 19, 1980, to file a statement of protest. Petitioner had until January 3, 1981, to file a reply to such protest. A protest may be filed by other carriers who object to the application for operating authority. As of December 20, 1980, 24 protests to CRST's application had been filed with the ICC.

When petitioner applied for a Sub 769 on October 9, 1980, it did not apply for an emergency or temporary operating authority. However, petitioner already had many temporary authorities in effect which had been acquired in conjunction with previous applications for permanent authority. These existing temporary authorities permitted petitioner to carry numerous types of commodities over a large number of routes. However, these temporary authorities did not cover all of petitioner's routes and commodities.

On November 3, 1980, petitioner held a special meeting of its board of directors. The sole purpose of the meeting was to consider declaring an "obsolescent loss" with respect to a substantial number of petitioner's operating authorities. At

that meeting, which lasted less than half an hour, petitioner's directors agreed to declare its operating authorities a "complete obsolescent loss." Petitioner's directors did not set a specific date for the recognition of that loss, but did indicate that it was to be recognized for the 1980 tax year. Petitioner did not notify the ICC or any other authorities of this action nor did it publicize the action through the trade.

Petitioner's president, John M. Smith (Smith), testified that, after the November 3, 1980, board meeting, it operated under various temporary authorities rather than the old operating authorities. To support that argument, petitioner introduced a "traffic study." This traffic study, which was prepared in anticipation for the litigation of this case, examined 10 percent of the loads transported by petitioner between January 2, 1981, and May 12, 1981. Petitioner used a 10-percent sample because "one in 10 is a common statistical sampling method used." For each load, it listed shipment date, freight bill number, origin, destination, commodity, and operating authority. Although contemporaneous records were made as to which operating authority had been assigned to a given load, they were not kept or retained by petitioner. The freight bills did not specify which authority was used. For purposes of its traffic study, petitioner simply assigned the authority which it deemed most likely to have been employed. However, Smith admitted at trial that more than one authority could have covered the loads listed in the traffic study. There was also testimony at the trial that, because of the delay in the issuance of Sub 769, some of the preregulation operating authorities were used occasionally to fill gaps.

Petitioner also introduced a series of lists, including a "List of CRST Authorities Used To Transport Traffic Between January, 1981 and May, 1981." Like the traffic study, these lists were prepared for this litigation. We find it difficult to follow these lists, and are not persuaded that they prove petitioner used the authorities designated during the various stated time periods.

Petitioner did not notify the ICC of its intent to abandon its operating authorities. Such notification to the ICC is not required. However, 49 U.S.C. section 10925(b) (1982), provides that the ICC must revoke an operating authority

pursuant to the holder's request. No showing is required for such a voluntary revocation request, and except in unusual circumstances, the ICC must comply. Petitioner did not request voluntary revocation of any of its operating authorities. Thus, the initial and subnumbered operating authorities which were the subject of the November 3 meeting were still on record with the ICC.

In 1981, Congress enacted section 266 of the Economic Recovery Act of 1981, Pub. L. 97-34, 95 Stat. 265-266 (ERTA section 266).[2] ERTA section 266, which is not part of the Code, provides for a 60-month amortization of all motor carrier operating authorities held by taxpayers prior to July 1, 1980, or acquired subsequent thereto pursuant to a binding contract in effect on July 1, 1980.

Petitioner did not claim a ratable 60-month deduction for its motor carrier operating authorities under section 266 for the taxable year 1980. Rather, petitioner deducted $3,660,929 on its Federal tax return for the taxable year 1980. That amount, which was claimed as an abandonment loss under section 165, was attributed to petitioner's alleged aggregate bases in the operating authorities which it allegedly abandoned in 1980.

## OPINION

The central issue in this case is whether petitioner may deduct, as an abandonment loss, the decline in value of its operating authorities caused by the Act.

Section 165[3] provides that a taxpayer may deduct any

---

[2]SEC. 266. DEDUCTION FOR MOTOR CARRIER OPERATING AUTHORITY.

(a) GENERAL RULE.—For purposes of chapter 1 of the Internal Revenue Code of 1954, in computing the taxable income of a taxpayer who, on July 1, 1980, held one or more motor carrier operating authorities, an amount equal to the aggregate adjusted basis of all motor carrier operating authorities held by the taxpayer on July 1, 1980, or acquired subsequent thereto pursuant to a binding contracting effective on July 1, 1980, shall be allowed as a deduction ratably over a period of 60 months. Such 60-month period shall begin with the month of July 1980 (or if later, the month in which acquired), or at the election of the taxpayer, the first month of the taxpayer's first taxable year beginning after July 1, 1980.

(b) DEFINITION OF MOTOR CARRIER OPERATING AUTHORITY.—For purposes of this section, the term "motor carrier operating authority" means a certificate or permit held by a motor common or contract carrier of property and issued pursuant to subchapter II of chapter 109 of title 49 of the United States Code.

[3]SEC. 165(a). GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

uncompensated loss sustained in the taxable year which is not compensated for by insurance or otherwise. Sec. 165(a). In general, the amount of the deduction equals the adjusted basis of the property involved. Sec. 165(b).

It has been repeatedly held that, in order for an abandonment loss to be sustained and deductible pursuant to section 165, there must be: (1) An intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment. *United States v. S.S. White Dental Manufacturing Co.,* 274 U.S. 398 (1927). In a similar vein, section 1.165-2, Income Tax Regs.,[4] provides for a loss deduction for obsolescence of nondepreciable property by allowing a deduction where, inter alia, such property is permanently discarded from use by taxpayer.

Where the taxpayer has not relinquished possession of an item there must be a concurrence of the act of abandonment and the intent to abandon, both of which must be shown from the surrounding circumstances, in order to determine if a loss has occurred in the year of the deduction. *A.J. Industries, Inc. v. United States,* 503 F.2d 660 (9th Cir. 1974); *Hummel v. United States,* 227 F. Supp. 30 (N.D. Cal. 1963). Mere intention to abandon alone is not sufficient to accomplish abandonment. *A.J. Industries, Inc. v. United States, supra.*

Although petitioner allegedly acted to abandon its operating authorities sometime between the November 3, 1980, board meeting and December 31, 1980, it continued to operate even though the new Sub 769 was not due for ICC approval until well into 1981. The Act did not obviate the requirement of ICC authorization for all loads. We cannot believe that petitioner would have given up absolutely the right to transport commodities over the highways by abandoning its authorities before it received the right to carry on its business under a newly issued authority. Nor are we persuaded that petitioner did not use the operating

---

[4]Sec. 1.165-2. Obsolescence of nondepreciable property.—(a) *Allowance of deduction.* A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or when such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.

authorities which it allegedly abandoned to satisfy these requirements during that interim period either solely, concurrently, or in conjunction with various temporary authorities.

Petitioner's traffic study does not persuade us that the subject operating authorities were not used between November 3, 1980, and May 12, 1981. Petitioner's assignment of various authorities in that study was not necessarily absolute. In other words, those loads could have possibly been carried under the operating authorities which petitioner allegedly abandoned.

Since we have found that petitioner did not effectively abandon the subject operating authorities in 1980, it could not have had the requisite combination of intent to abandon and the act of abandonment. Thus, for purposes of section 165, petitioner did not abandon the operating authorities in 1980 and is not eligible for a complete deduction of their aggregate bases in that year. As noted in our Findings of Fact, in 1981 Congress enacted ERTA section 266 which provided retroactive relief for motor carriers in situations similar to petitioner's by allowing them to amortize over a 60-month period their unrecovered costs in all operating authorities held by them prior to July 1, 1980. But petitioner did not choose to take advantage of this provision. Instead, it deducted its entire unrecovered cost of all of its operating authorities in the year 1980.

In order to qualify for an abandonment loss deduction, petitioner must establish that it has sustained a deductible loss. Whether a deductible loss has been sustained is a question of fact which must be determined by reference to all the surrounding circumstances. *Burke v. Commissioner,* 32 T.C. 775 (1959), affd. 283 F.2d 487 (9th Cir. 1960). Section 1.165-1(b), Income Tax Regs.,[5] provides that, to be allowable as a deduction, the loss must be "evidenced by closed and completed transactions fixed by identifiable events." See *United States v. S.S. White Dental Manufacturing Co., supra.* Mere diminution in value does not

---

[5]SEC. 1.165-1(b). *Nature of loss allowable.*—To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and section 1.165-11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

qualify. *United States v. S.S. White Dental Manufacturing Co., supra.*

Petitioner argues that, in determining whether it has sustained a deductible loss, we must defer to its subjective judgment as to value. Petitioner relies on *A.J. Industries, Inc. v. United States,* 503 F.2d 660 (9th Cir. 1974), in which the Ninth Circuit held that, in determining whether a taxpayer has sustained a loss, the subjective judgment of the taxpayer as to future value of business assets should be entitled to great weight and that "a court is not justified in substituting its business judgment for a reasonable well-founded judgment of the taxpayer." 503 F.2d at 670. Petitioner then argues that its conduct subsequent to the Act, including its application for Sub 769 authority and the November 3, 1980, board of directors meeting, is proof of its subjective belief that its old operating authorities had become valueless.

We agree that petitioner's informed judgement as to the fair market value of its business assets should be accorded great weight. However, the decrease in value alone of a right or rights conveyed by a permit or license is not deductible absent some affirmative act of abandonment of such permit or license. In that respect, this case is somewhat similar to *Consolidated Freight Lines, Inc. v. Commissioner,* 37 B.T.A. 576 (1938), affd. 101 F.2d 813 (9th Cir. 1938). In *Consolidated,* the taxpayer, a motor carrier company, had acquired at substantial cost a certificate of convenience and necessity, which was a prerequisite for entering business under a State statute. Such certificates could only be issued for one territory at a time, thus creating a monopoly. Subsequent legislation removed the monopolistic character of those certificates. The taxpayer claimed a deductible loss for the year the legislation became effective on the grounds that it had paid valuable consideration for the monopolistic rights and that the destruction of those rights resulted in a deductible loss. In affirming the Board of Tax Appeals, the court denied petitioner's claimed loss deduction stating:

> Destruction of the statute which put an end to the monopoly did not destroy the certificates, nor their value. The thing destroyed was the right of monopoly conferred by the statute not by the certificate. What

interest did petitioner have in the rule of law, declared by statute? "No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit * * * " *New York Central R.R. Co. v. White,* 243 U.S. 188, 198; *Second Employers Liability Cases,* 223 U.S. 1, 50. Whatever right the statute conferred on petitioner was subject to the right of the state to change it. When petitioner purchased the certificates, it did not purchase a monopoly, but the means by which it might take advantage of a monopoly conferred by statute. It now has had no loss of such means, for they exist now as before. We think petitioner suffered no loss on the certificates, for the thing destroyed was not a part thereof. [101 F.2d 813, 815].

In *Consolidated,* we reasoned that the taxpayer had not lost any rights conferred by the certificate of operating authority because the taxpayer was still permitted to do business under the certificate. The operating authorities themselves had not given any further rights. The "monopoly rights" were merely a byproduct of the statute. Since the taxpayer could not own property rights in legislation, modification of such legislation did not give rise to a deductible loss, even if it had the result of making taxpayer's business property less valuable. The fact that the taxpayer continued to use the certificate meant that there was no closed transaction, and that no deductible loss was incurred.

Similarly, in *Beatty v. Commissioner,* 46 T.C. 835 (1966), taxpayer had acquired a liquor license, at considerable cost, as part of the purchase of a business. Subsequent legislation restricted the transfer of liquor licenses such as the one purchased by taxpayer, while also permitting the issuance of additional licenses. As a result of the legislation, taxpayer's liquor license suffered a decline in value. We denied taxpayer's loss deduction noting that the rights conferred by the license, i.e., the right to sell liquor, remained viable and could not be severed from other rights which the license may have conferred. See also *Reporter Publishing Co. v. Commissioner,* 201 F.2d 743 (10th Cir. 1953), cert. denied 345 U.S. 993 (1953).

For purposes of the closed and completed transaction rule, the various rights which petitioner may have held with respect to its existing operating authorities cannot be split into separate pieces of property so that the elimination of one such right will constitute a closed and completed

transaction within the meaning of the statute. Since we have found that petitioner did not effectively abandon its operating authorities, we must conclude that petitioner continued to maintain the rights expressly conferred by those operating authorities, i.e., the right to transport specified commodities along designated routes. Therefore, the decrease in value of the operating authorities which petitioner allegedly abandoned, incurred as a product of the Act, does not give rise to a deductible loss pursuant to section 165.

In view of the foregoing,

*Decision will be entered for the respondent.*

