## TONAWANDA COKE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2894-88.          Filed August 8, 1990.

*E.W. Dann Stevens,* for the petitioner.
*Gary Borek* and *Gary Bluestein,* for the respondent.

WRIGHT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for taxable year 1983 in the amount of $358,074. After concessions by both parties, the sole issue remaining for decision is whether a portion of the cost of repairing a fire-damaged coke plant is attributable to a demolition for purposes of section 1.165-3(a)(1), Income Tax Regs., and therefore is properly chargeable to capital account with respect to the underlying land, rather than with respect to the coke plant.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and accompanying exhibits are incorporated herein.

Petitioner Tonawanda Coke Corp. (hereinafter referred to as petitioner) has its principal place of business in Tonawanda, New York. In June 1977, a coke plant (hereinafter referred to as the plant) owned and operated by Allied Chemical Corp. was offered for sale. The plant employed 60 coke ovens in producing coke. Each oven holds 19 tons of

coal, which is heated to 22,000 degrees to produce coke. The coke ovens are made of brick and mortar. The ovens must be kept hot at all times, or the mortar will contract, and the ovens will collapse. The minimum temperature at which the ovens can be maintained is 12,000 degrees. Each of the 60 ovens has a value in excess of $1 million. The gases which are produced in the coking process, which are captured and transported by pipeline, are purified and then recycled to heat the ovens. The plant occupied 160 acres.

The Donner-Hanna Coke Corp. (Donner-Hanna) was interested in purchasing the plant. Donner-Hanna was represented during negotiations by J.D. Crane, its vice president and general manager. Crane inspected the plant and became familiar with its operations. Crane had 30 years' experience in managing coke plants with Donner-Hanna, and was familiar with all aspects of coke-making operations. As a representative of Donner-Hanna, he went so far as to sign a letter of intent to purchase the plant. However, the board of directors of Donner-Hanna ultimately declined to make the purchase.

On December 23, 1977, there was an explosion, and resulting fire, at the plant. The cause of the fire was the rupture of a large, steel tar storage tank. The rupture allowed more than 300,000 gallons of molten tar to inundate part of the plant. Approximately 100 firemen battled the fire with water hoses.

Only a small area of the plant was destroyed by the fire. However, the area which was destroyed was critical to the plant's operation. Among the damages caused by the fire were the losses of the gas delivery system, the liquid flushing system, and the tar containment systems. The two buildings most affected by the fire were the byproducts pump house and the exhauster building. The byproducts pump house contained several large pumps and motors which were later reconditioned and put back into service. The exhauster building contained an exhaust mechanism (a large pump which circulates gases) which was destroyed and had to be replaced. The plant could not operate without repairs to these areas. Areas of the plant which were not critical to its operation, such as the roofs of several buildings, were also damaged.

As a result of the rupture of the tar storage tank, a large area of the plant was covered with burning tar, which solidified due to the winter temperatures. The tar covered 40 acres of the plant site to a depth of 18 inches. The water which was used to combat the fire turned to ice, with a thickness of up to 2 feet, atop the hardened tar.

Upon learning of the fire, Crane, acting in his individual capacity rather than as an officer of Donner-Hanna, immediately visited and inspected the plant. Though Allied Chemical Corp. was doubtful the plant would ever operate again, Crane believed he could get the plant back into operation within 10 days. Crane formed and incorporated petitioner in January of 1978. On January 10, 1978, petitioner offered to purchase the plant. After completing negotiations with Allied Chemical, petitioner purchased the coke plant on January 27, 1978, a Friday. Crane, as chief executive officer of petitioner, planned to immediately restore the damaged portion of the coke plant and resume production of coke.

On Saturday, January 28, 1978, Crane and approximately 150 workers started putting the plant back into operation. Among the contractors hired by petitioner to repair the plant were John W. Danforth Co., Rupp Rigging, and Great Lakes Wrecking.

The work performed by John W. Danforth, a pipe-fitting company, involved replacement of piping from the byproducts pump house into the primary and secondary coolers, replacement of gas piping into new exhausters, and replacement of other gas, liquid, and steam piping. Most of the existing piping was rebuilt and reused. John W. Danforth's invoice totaled $240,226.

The work performed by Rupp Rigging involved repair of the secondary gas cooler (part of the exhauster mechanism) and installation of a new flushing liquid collecting tank. The secondary gas cooler had been left standing at a 45-degree angle after the fire due to damage to a portion of its base. Rupp Rigging lifted the tank, which has a diameter of 10 feet, removed the damaged portion of the base of the tank, and welded the new portion of the base. Rupp Rigging also shored up portions of buildings damaged in the fire, and strengthened the existing structural steel framework to provide a measure of safety to the workers. Rupp Rigging

does not perform demolition work. Rupp Rigging's invoice totaled $135,199 and described the work performed, in part, as "for services to dismantle fire damaged equipment, to transport to offload areas."

The work performed by Great Lakes Wrecking consisted primarily of breaking up tar and ice in the area. Great Lakes Wrecking moved the broken tar to a coal field adjacent to the coke plant. Great Lakes Wrecking also removed damaged piping and equipment in preparation for the installation of new piping by John W. Danforth. However, they did not remove the framework which supported the piping.

Finally, Great Lakes Wrecking cleaned fallen roofing, insulation, and any bent steel or piping which was in the way of the repair work. Any parts or equipment that were salvageable were used or set aside during cleanup and rebuilding. In addition, approximately one-half of the spilled tar was recycled by the plant for the production of coke. Great Lakes Wrecking's invoice totaled $62,039. The invoice describes the nature of the work done as being "for clean-up and building dismantlement."

From the date of the fire, and throughout the rehabilitation period, the 60-oven battery was kept at "idle-hot" by burning natural gas. The cost of heating the ovens was $5,000 to $10,000 per day. Thus, each day the plant was out of operation cost petitioner at least $5,000. Following completion of the rehabilitation work, coke production resumed at the coke plant on February 17, 1978. As of the date of trial, the plant was operating in the same buildings it utilized prior to the fire. None of the buildings or equipment essential to the operation of the plant were torn down. The tar tank which had exploded was not replaced or discarded for a period of 1 year after the fire. None of the expenses at issue are attributable to the tar tank. None of the major structural damage to the plant, such as the loss of roofs, was repaired as of the date of trial.

In preparing its Federal income tax return for taxable year 1978, petitioner capitalized the cost of the work done to rehabilitate the plant, including the cost of the work performed by John W. Danforth, Rupp Rigging, and Great

Lakes Wrecking, pursuant to section 1016(a)(1)[1], and added the cost to its basis in the plant. Petitioner then depreciated the cost on the basis of a 15-year useful life.

Respondent determined that petitioner was not allowed depreciation in the amount of $75,956 on the total capital expenditures of $1,086,600 made in 1978 for rehabilitation of the coke plant because the expenditures were "demolition costs." Respondent later conceded that all but $437,464 of the total expenses were properly capitalized and depreciated. However, respondent determined that the amounts paid to John W. Danforth, Rupp Rigging, and Great Lakes Wrecking, totaling $437,464, were attributable to demolition costs, the need for which petitioner was aware of when it purchased the plant, and that therefore, under section 165 and the regulations thereunder, such costs must be added to petitioner's basis in the underlying land, rather than to its basis in the plant itself.

## OPINION

Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. The regulations provide that the loss incurred in a trade or business due to a demolition of old buildings shall be allowed as a deduction under section 165(a), subject to conditions not relevant to the instant case, if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. Sec. 1.165-3(b)(1), Income Tax Regs.[2]

However, the regulations also provide that if real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon, no deduction shall be allowed under section 165(a) on account of the demolition of the old buildings. Sec. 1.165-

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Sec. 280B(a), amended by sec. 1063(a) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 1047, applicable to demolitions commencing after July 18, 1984, in taxable years beginning after Dec. 31, 1983, provides, in relevant part, that in the case of the demolition of any structure, no deduction shall be allowed to the owner for any amount expended for such demolition or any loss sustained on account of such demolition, and such amount shall be treated as properly chargeable to capital account with respect to the land on which the demolished structure was located.

3(a)(1), Income Tax Regs. The entire basis of the property so purchased, the regulations provide, shall be allocated to the land, rather than the buildings. In addition, the basis of the land shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. Sec. 1.165-3(a)(1), Income Tax Regs.

The reasoning behind section 1.165-3(a)(1), Income Tax Regs., is that where a buyer purchases land with the intent to demolish a building existing thereon and erect a new one, the building has no value to the buyer and therefore all of the purchase price should be allocated to the land. *N.W. Ayer & Son, Inc. v. Commissioner,* 17 T.C. 631, 635 (1951).

Respondent argues that the expenses at issue are attributable to the partial demolition of the plant, which petitioner had intended when it purchased the plant, and therefore must be allocated to petitioner's basis in the land pursuant to section 1.165-3(a)(1), Income Tax Regs. Petitioner does not question the validity of section 1.165-3(a)(1), Income Tax Regs. Petitioner argues that the expenses at issue are attributable to repairs, and thus no demolition occurred.

Petitioner contends that the repairs are capital expenditures properly allocable to the plant. If a partial demolition did occur, petitioner argues, it was not intended when the plant was purchased. Petitioner bears the burden of proof. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933).

In arguing that the expenses at issue were for demolition, respondent relies primarily on *Gilman v. Commissioner,* 72 T.C. 730 (1979), in which we held that the partial demolition of a building was a deductible loss under section 1.165-3(b)(1), Income Tax Regs. In *Gilman* the taxpayer demolished the roof of a building used in his business so that a second floor could be added. In addition, the taxpayer removed several air-conditioning units which belonged to his tenants. He scrapped the old units and reimbursed his tenants by installing new air-conditioning units. There were two demolition-related issues in *Gilman:* (1) Whether the demolition of the roof qualified as a deductible loss under section 1.165-3(b)(1), Income Tax Regs., and (2) whether the removal of the old air-conditioning units and installation of

new ones qualified as a deductible loss under section 1.165-3(b)(1), Income Tax Regs.

With regard to the first issue, we held that the taxpayer was entitled to a deduction for the cost of demolishing the roof under section 1.165-3(b)(1), Income Tax Regs. *Gilman v. Commissioner, supra* at 742. However, we noted that the parties had stipulated that the expenses at issue were expended for the demolition of the roof. *Gilman v. Commissioner, supra* at 739. Thus, whether the removal and replacement of a roof constitutes a demolition for purposes of section 1.165-3(b)(1), Income Tax Regs., was not at issue. In the instant case, petitioner argues that no demolition occurred.

With regard to the second issue, we held that the removal and replacement of the air-conditioning units was also a demolition for purposes of section 1.165-3(b)(1), Income Tax Regs. However, we noted that the old air-conditioning units were the property of the taxpayer's tenants, as were the new units. *Gilman v. Commissioner, supra* at 743. The taxpayer, we reasoned, was obligated to compensate his tenants for their air-conditioners when his demolition of the roof to the building required a scrapping of the units. We concluded that demolishing and replacing the air-conditioners was so directly tied to the demolishing of the roof that it was an integral part of that demolition cost. *Gilman v. Commissioner, supra* at 743.

However, we distinguished a case where the air-conditioners belonged to the taxpayer, stating that "If the air conditioners had belonged to petitioner, any portion of their basis which had not been recovered by depreciation at the time they were scrapped would be deductible when they were scrapped, and the new air conditioners placed on the second story roof would be depreciable over their useful life." *Gilman v. Commissioner, supra* at 742.

The instant case is distinguishable from *Gilman* because (1) petitioner does not concede that any demolition occurred, and (2) petitioner owned all of the property which was repaired and replaced. We therefore find that *Gilman* does not support respondent's position.

Respondent also cites several Memorandum Opinions of this Court in support of his argument that the removal of damaged piping and debris constitutes a demolition. *Argo v.*

*Commissioner,* T.C. Memo. 1982-732 (demolition of existing irrigation system in order to convert to new system); *Savage v. Commissioner,* T.C. Memo. 1981-278 (demolition of foundation of fire-damaged house in order to build new house); *Wilson v. Commissioner,* T.C. Memo. 1980-514 (demolition of prune trees in order to plant row crops).

All of these cases are distinguishable in that a demolition, though a partial one, unquestionably took place. Petitioner does not argue that a partial demolition of the coke plant would not constitute a demolition for purposes of section 1.165-3(a)(1), Income Tax Regs. Rather, petitioner argues that there was no demolition of any part of the coke plant. Thus, the cases cited by respondent are inapplicable.

Neither the applicable regulations, nor the case law interpreting the regulations, define "demolition." *Gilman v. Commissioner, supra* at 737. However, we believe that the meaning of "demolish" as commonly used is appropriate in this context. See *First Savings & Loan Association v. Commissioner,* 40 T.C. 474, 482 (1963). Black's Law Dictionary (5th ed. 1979) defines "demolish" as "To throw or pull down; to raze; to destroy the fabrication of; to pull to pieces; hence to ruin or destroy." Funk & Wagnall's New Standard Dictionary (1959) defines "demolish" as "To destroy by tearing or throwing down, as a building, wall, or the like; separate the fabric or ruin the structure of; raze; dismantle."

We find that petitioner has satisfied its burden of proving that in the instant case no part of the coke plant was demolished. Petitioner has proven, through the testimony of its chief executive officer, its plant manager, its plant engineer, and officers of John W. Danforth, Rupp Rigging, and Great Lakes Wrecking, that the expenses at issue are attributable to the repair of damage and removal of debris caused by the fire. While we recognize that the invoices submitted by Rupp Rigging and Great Lakes Wrecking on their face indicate that some demolition may have occurred, the testimony introduced at trial proves such was not the case.

Each witness testified that no part of the plant was demolished. William Weber, vice president of Rupp Rigging, testified that the work performed by his company consisted of "beefing up" the existing, fire-damaged structural steel

to make it safe to be worked on by other contractors. John Eustace, general foreman of John W. Danforth, testified that the work performed by his company consisted of fabricating and installing replacement piping for the piping which was destroyed in the fire. William Hewitt, vice president of Great Lakes Wrecking, testified that his company was hired to "go in and cleanup everything and to try and get it back in order for them." In addition to such testimony, petitioner introduced into evidence photographs of the plant, both before and after the repairs, which establish that the infrastructure remained the same after the repairs as before.

In addition to the abundant evidence introduced by petitioner showing that no demolition occurred, we have previously held in cases involving similar expenditures that the taxpayer was required to capitalize the expenditure and add it to his basis in improvements, rather than to the land itself. See *Hotel Sulgrave, Inc. v. Commissioner,* 21 T.C. 619 (1954); *Tidwell v. Commissioner,* T.C. Memo. 1961-162, affd. 298 F.2d 864 (4th Cir. 1962).

Because no demolition occurred, section 1.165-3(a)(1), Income Tax Regs., is inapplicable, and petitioner properly capitalized the cost of the work done to rehabilitate the plant and added the cost to its basis in the plant.

In light of the foregoing, and after concessions by both parties,

*Decision will be entered under Rule 155.*