JAMES LEE STANDLEY AND CARLA RAE STANDLEY,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 12593-90.      Filed August 18, 1992.

*Thomas F. Kelly,* for petitioners.
*Janice D. Newell,* for respondent.

GERBER, *Judge:* Respondent determined a $12,983 Federal income tax deficiency for petitioners' 1986 taxable year. The issues for our consideration are: (1) Whether amounts received, through a dairy termination program, in excess of the fair market value of cows are taxable as ordinary or capital gains income; (2) the fair market value of petitioners' cows; and (3) whether petitioners are entitled to a deduction for extraordinary obsolescence or abandonment of their dairy parlor, manure pit, and dairy equipment.

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## FINDINGS OF FACT

Petitioners, at the time of the filing of their petition, had their legal residence in Emmett, Idaho. Petitioner James L. Standley (petitioner) was raised in a dairy farming family and is an experienced dairy farmer. Petitioner purchased a dairy farm in 1980, including about 60 milk cows. Petitioner kept his herd in good condition, monitoring somatic cell count information and regularly maintaining the condition of his animals. In his breeding practices he attempted to increase milk production and butterfat content. For 1984 and 1985 petitioner earned gross income from dairy farming of $256,157 and $285,255, respectively.

Petitioner entered into the Federal Dairy Termination Program (DTP) during 1986. The DTP was enacted by section 101(b) of the Food Security Act of 1985, Pub. L. 99-198, 99 Stat. 1354, 1363. The DTP was a voluntary program under which the Federal Government paid farmers to take their dairy herd out of production. The purpose of the DTP was to reduce the supply of milk in the United States. If farmers became involved in the program, they were required to cease milk production by either exporting or slaughtering their cows. Additionally, participants agreed not to engage in the dairy farming business for a minimum of 5 years.

In order to participate in the DTP, a dairy farmer was required to make a bid price per hundredweight of milk[1] which would be multiplied by the farmer's established production base. The bidder was required to provide the production base for the lower of the period ending June 1, 1985, or December 31, 1985. The bids then were submitted to the Government in a closed bidding process. Next, the Government set a maximum limit and generally accepted all bids below that set number.

---

[1] Dairy production and transactions are commonly measured in 100-pound units of milk. It was the Government's intent to eliminate 13 million pounds of milk production from the national marketplace.

Petitioner's milk production for the measuring period was 2,262,127[2] pounds of milk and he bid $14.99 per hundredweight. His bid was accepted and petitioner entered into a DTP contract under which he was to receive a total of $338,938.89, computed by multiplying $14.99 times 22,611 hundredweights of milk production. Petitioner chose to receive $271,151.11 the first year and four subsequent annual payments of $16,946.94.

In addition, petitioner agreed to dispose of 300 cows. During the period June 19, 1986, through August 13, 1986, petitioner sold cows and calves for slaughter at prices ranging from as low as $0.2925 to as high as $0.70 per pound. Those sales resulted in actual sales proceeds during 1986 of $81,594. Petitioner received and retained the proceeds from the sale of the animals. Petitioners claim that each of the 252 animals sold had an average fair market value of $1,274, so that the difference between their value and the amount received was $239,454 ($1,274 x 252 = $321,048 – $81,594 = $239,454). Respondent determined that each of the 252 animals had an $860 fair market value, so that the difference between the value and the amount received was $135,126 ($860 x 252 = $216,720 – $81,594 = $135,126). Petitioner did not obtain an independent appraisal of the animals sold in connection with the DTP.

Prior to the program and making his bid, petitioner sold some cows for $0.60 and $0.70 per pound. Petitioner, prior to the time of the DTP, had purchased 13 cows for about $1,000 each and about 35 cows for less than $700 each. Additionally, petitioner had purchased three cows in 1984 for $1,267 each. The highest price petitioner had paid for a cow was $1,340. Petitioner purchased cows during 1980 through 1985 for prices ranging from $670 to $1,267. In the year prior to the DTP offer (1985), petitioner had purchased cows for $1,000 each. The highest price petitioner had ever received for the sale of a cow was $500 to $600. However, these sales involved animals which were not producing milk and their value was solely attributable to their flesh.

At the close of bidding, some or all of the bidders may not have been aware of the amounts of other bids. Each bid was

---

[2] This figure varies slightly from the 22,611 hundredweight figure used to compute the amount under petitioner's DTP contract. The difference is not explained in the record.

final and the Government would pay on bids up to an amount to be established. This amount was not disclosed prior to the close of the bidding period. After the close of the bidding, it was disclosed that the Government would have accepted bids up to $22.50. The highest bid made and accepted was $21.50. At some point after petitioner's $14.99 bid was accepted, he unsuccessfully attempted to withdraw his bid.

The U.S. Department of Agriculture (USDA) prepares an annual summary of agriculture statistics on agricultural price information received from farmers regarding various commodities. This information has been maintained since 1930 and is published and used by farmers and accountants. On a monthly basis during 1986, 300 Idaho dairy farmers furnished information concerning the price received for dairy cows. The average price reported for the sale of dairy cows in Idaho during 1986 was $860.

At the time of petitioner's DTP contract he had 161 cows, 50 heifers, and 89 calves.[3] Petitioners reported the sale of 252 mature dairy cows on their 1986 Federal income tax return. Petitioner's dairy herd consisted of unregistered Holsteins and Jerseys. Petitioner did not maintain records of individual milk production.

Although petitioner had disposed of the dairy herd, he continued to be involved in raising beef cattle. Some of the assets and equipment used in petitioner's dairy operation were of no utility in raising beef cattle. The milking equipment, milk parlor, and manure pit were not used by petitioner in connection with raising beef cattle. The manure pit (which is also referred to as a "honey" pit by the parties) is an underground concrete pit which is 8 feet deep, 120 feet long, and 16 feet wide. The manure pit was used to collect liquid manure from the dairy parlor for purposes of disposal. The manure pit was located beneath the corral holding the beef cattle. However, the manure pit was not used to collect the manure from the beef cattle. Petitioner was able to haul the beef cattle manure from the corral in a manure spreader.

---

[3] A "cow means any female dairy bovine that has had one or more calves." A "heifer" means any female dairy bovine which: (1) weighs 500 pounds or more or is pregnant; and (2) has not yet had a calf." A "calf" means any female dairy bovine which weighs less than 500 pounds and is not pregnant [has not had her first calf and is not producing milk]." See 7 C.F.R. sec. 1430.452(g), (p), (u) (1992). A mature heifer about ready to have a calf or a cow between 2 and 5 years old generally commands the highest market value.

The manure pit was about 20 years old and petitioner claimed $1,000 of depreciation attributable to it for 1986.

At the time of trial the milking equipment and milk parlor were all in place, but were deteriorated or in a state of "ill-repair". On their 1986 return, petitioners claimed the remaining undepreciated basis ($39,091) of the milk parlor and milking equipment as an abandonment loss. By an amended petition, petitioners also claimed an abandonment loss of $14,083 attributable to the undepreciated basis of the manure pit. Although as of the end of 1986 petitioner was not using the dairy fixtures and equipment, he had not abandoned the possibility of reentering dairy farming after his 5-year agreement expired.

OPINION

We consider here several questions generated by petitioner's involvement in the DTP. This is our first opinion considering the tax effect of the DTP. Respondent, in connection with the DTP, issued Notice 87-26, 1987-1 C.B. 470. The following explanation of the DTP is set forth in Notice 87-26:

payments [are made] to a milk producer who enters into a contract that provides that the milk producer will sell all the producer's dairy cattle for slaughter or export and who, for a period of five years beginning on the date specified in the contract, agrees not to acquire any interest in dairy cattle or in the production of milk or make available to any person any milk production facility. The payments under the DTP are intended to compensate the milk producer for lost receipts from two sources. *First, the payments compensate the producer for the difference between the amount received when the dairy cattle are sold under the DTP and the higher price that could have been received if the cattle were sold for dairy purposes. Second, the payments are also intended to replace receipts from the milk production operation.* [Emphasis supplied.]

Under the interpretation contained in the notice, the amount received from the Government, to the extent it exceeded fair market value for dairy purposes, is taxed as ordinary income. To the extent that amounts received for slaughtered or exported dairy animals are less than the fair market value, they would result in income taxable as capital gain.[4] Before we consider the characterization of the income,

---

[4] Ordinary income or capital gain would result only to the extent that amounts received also exceeded the milk producer's bases in the animals.

we must decide the fair market value of the cows disposed of in connection with participation in the DTP.

*Fair Market Value of Cows*

Petitioners claimed a fair market value[5] of $1,274 for each of the 252 animals disposed of during the taxable year. Respondent determined that the fair market value was $860 each. "Fair market value" is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. *United States v. Cartwright,* 411 U.S. 546, 551 (1973). The question of fair market value is a question of fact. *Goldstein v. Commissioner,* 89 T.C. 535, 544 (1987).

Petitioner did not obtain a separate appraisal at the time of the DTP program. He reached the $1,274 as the average fair market value based upon his estimations which were formulated after the transactions in question. Respondent utilized the USDA statistical summary of agricultural product prices, which is compiled for specific political and/or geographical localities. The average price compiled by the Government for dairy cows bought or sold by Idaho farmers for 1986 was $860 per cow.

Petitioner pointed out that "At the time the milk cows were sold for slaughter, it was not known that a somewhat 'theoretical' fair market value would be critical in establishing the tax treatment of the government payment." In spite of this, petitioners contend that petitioner husband was in the best position to value the animals because of his many years of experience as a dairy farmer and his personal knowledge of the animals. Petitioners also contend that the dairy herd was above average because of the use of artificial insemination and high-quality maintenance programs. Petitioner explained that the DTP was, in theory, like selling his cows to a neighbor willing to pay more than they were worth. In essence, petitioner sees the Government as a "foolish buyer" willing to pay a premium price.[6]

---

[5] Petitioners and respondent both have utilized an average fair market value which was applied to each animal equally.

[6] Petitioners also argue that the herd or each animal should be attributed a greater value because under the DTP the Government was also purchasing an amount of goodwill or going-concern value. While there was no goodwill value associated with the sale of petitioner's cows for slaughter, we will consider that argument in connection with the proper characterization of the

Respondent agrees that it would have been difficult for petitioner to appraise the cows during early 1987 when he was preparing his 1986 Federal income tax return. Respondent also emphasizes the fact that petitioners did not offer contemporaneous records of the cows' milk production. This factor would be significant in valuing a producing dairy cow.

We accept the USDA average price of $860 and hold that it is most representative of the average fair market value of each of petitioner's 252 cows. This method is the most direct and reliable means of valuing the animals under the circumstances.[7] These statistics are similar to those available concerning active market situations such as over-the-counter stocks and automobiles. In those situations publications such as the Wall Street Journal (see *Meyer v. Commissioner*, 46 T.C. 65, 106 (1966), affd. in part, vacated in part 383 F.2d 883 (8th Cir. 1967)) or the National Automobile Dealers Association's "Bluebook" (see *Estate of Adams v. Commissioner*, T.C. Memo. 1973-113) provide bid and asked prices in the marketplace. Similarly, in this case the Government compiled statistics which we have found to be reliable. See *Tolson v. Commissioner*, T.C. Memo. 1987-578.

Although petitioner may have maintained the dairy herd at an above-average level, there was no evidence supplied or other means provided which would permit us to find that such was the case or to provide a methodology to quantify that factor into the value computation. The vast majority of dairy animals purchased were owned by petitioner at the time of the DTP and were purchased for less than $860. Petitioner sold only a few animals and the selling price was below the $860 value determined by respondent. Although

---

payment received from the Government under the DTP.

[7] In this regard respondent's Notice 87-26, 1987-1 C.B. 470, 471, contained the following discussion concerning the proof of the market value of dairy cows:

(3) The portion of the payment that compensates the milk producer for a below market sale of the cattle must be determined with reference to all of the facts and circumstances. The remainder of the DTP payment is the portion of the payment that replaces milk production receipts. The milk producer must show specific evidence that the milk producer's cattle were actually sold for less than the producer could have obtained for them had they been sold for dairy purposes, at the same general time and at the same general geographical location as the producer actually sold them. * * * The Internal Revenue Service will accept as specific evidence of the price at which a milk producer could have sold the cattle for dairy purposes the price published in "Agricultural Prices," by the United States Department of Agriculture, National Agricultural Statistics Service, Agricultural Statistics Board, for milk cow sales in the state in which the milk producer sold the cattle during the year and month in which the milk producer actually sold the cattle. * * *

petitioners argue that those sales were not of their best bred milk-producing cows, we have no benchmark from which to evaluate petitioners' claim other than petitioner husband's own self-serving testimony. In that regard, we agree with respondent that petitioner's failure to keep detailed records of milk production and other pertinent data concerning his cows was detrimental to petitioners' position in this case. We also note that petitioner's animals were unregistered and that fact would generally result in a lower value. See *Tolson v. Commissioner, supra.*

Having decided the fair market value, now we must consider whether the taxable portions of the amounts received by petitioner under the DTP should be characterized as ordinary income or capital gains.

## Characterization of the Taxable Portion

It is not disputed that the amounts in controversy are income to petitioners. The controversy concerns the characterization of the income as capital or ordinary. To resolve this issue we must decide what in particular petitioner gave in exchange for the DTP payments.

Respondent, in Notice 87-26, 1987-1 C.B. 470, 471, provided, in pertinent part, the following tax return filing guidance to taxpayers involved in the DTP:

(1) To the extent that a portion of the DTP payment compensates the milk producer for selling dairy cattle at a lower price, that portion represents an additional amount realized on the sale of the cattle. If the two-year holding period requirement of section 1231(b)(3)(A) of the Internal Revenue Code is met on the date the milk producer sold raised dairy cattle, whose costs have been previously expensed, the total amount realized on the sale of the cattle is eligible for reporting as gain under section 1231 of the Code. * * *

(2) The portion of the DTP payment in excess of the amount that compensates the milk producer for selling dairy cattle at a lower price is not an amount realized on the sale of cattle, but is a replacement for milk production receipts, and thus is ordinary income. * * *

* * * * * * *

(4) The portion of the DTP payment that is not treated as an amount realized on the sale of the dairy cattle is includible in determining a milk producer's net earnings from self-employment and subject to the taxes imposed on self-employment income if the milk producer operated the milk production unit personally or through agents or employees, or if the milk production unit was operated by others and the milk producer participated

materially in the production of the milk or in the management of the milk production unit.

Respondent, on brief, follows the position set forth in Notice 87-26, *supra*.[8] Under that position, petitioners are entitled to treat as capital gain the amounts received in selling the dairy animals for slaughter or export and from the Government under the DTP up to the $860 per animal fair market value and to the extent that the proceeds exceed basis. The remainder (amount in excess of $860 per animal), under respondent's position, would be treated as ordinary income to the extent it exceeds basis.[9] Respondent contends that such excess was intended to replace receipts from the dairyman's milk production operation. In support of this position, respondent cites *Lyeth v. Hoey,* 305 U.S. 188, 195-197 (1938); *Fono v. Commissioner,* 79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); and *Roeser & Pendleton, Inc. v. Commissioner,* 15 T.C. 966 (1950), affd. 196 F.2d 221 (10th Cir. 1952). Under those cases, respondent argues that the DTP payments are in exchange for petitioner's giving up the right to compensation or income from rent or use of the farm or animals for dairy production. Such payment, it is argued, assumes the taxable character of the right given up in exchange, which respondent argues would have been taxable as ordinary income.

Respondent, citing *Annabelle Candy Co. v. Commissioner,* 314 F.2d 1, 7 (9th Cir. 1962), affg. T.C. Memo. 1961-170, also advances the argument that petitioner's agreement not to produce milk for 5 years was a covenant to refrain from competition which results in ordinary income.

Petitioners argue that respondent's Notice 87-26, *supra,* and litigating position are in error and that the payments, to the extent they exceed the fair market value of the dairy animals, are attributable to an intangible asset, such as goodwill, going-concern value, or sale of some type of property right. Sale of this type of property, argue petitioners, could result in capital gain.

---

[8] In this regard, we note that Notice 87-26, *supra,* was published after the close of the 1986 calendar year and around the time individual income tax returns for calendar year 1986 were due—Apr. 15, 1987. Additionally, it should be noted that respondent's notice does not have the force and effect of law and/or is not regulatory in nature. At best, it can be considered the position of a party. In this case, respondent's position was not available to petitioners at the time petitioner husband participated in the DTP.

[9] It is unlikely that petitioners would have a tax basis in cows that they had bred.

Petitioners contend that the payments are for capital assets. Petitioners theorize that either the payments are overly generous payments for the dairy herd or the excess over the herd's value is attributable to going-concern value, goodwill, or some other intangible aspect of petitioner's dairy business. We cannot agree with petitioners.

Both parties have approached these factual transactions theoretically. Each has provided analogies in order to argue for a proposed characterization of the income in question. We think it unnecessary to theorize about the nature of the payments received. Petitioner received two types of payments in connection with the DTP program. Petitioner received $81,594 from the sale (to entities other than the Government) of dairy animals for slaughter or export. He also received $271,151.11 during 1986 from the Government as part of the $338,938.89 in total payments under the DTP.

There is no need to analogize with respect to the payments received for sale of the dairy animals to various slaughter houses. That source of payment was in exchange for dairy animals which, under section 1231, would be treated as capital assets. It is not necessary to consider any restrictions on the use of the animals under the DTP contract. Petitioner agreed to sell the dairy animals to the various slaughter houses in separate arm's-length transactions. Those transactions were between a willing buyer and willing seller who were in no manner restricted, at least as to the terms of those transactions. Petitioner could have sought the maximum "slaughter price" possible for his animals.

The amounts from the Government represent a second source of payment petitioner received in connection with the DTP. In this regard, the Government did not contract to purchase capital assets from petitioner. The agreement between the Government and petitioner does not state the purpose for the DTP payments, but certain requirements were placed upon petitioner in order to be entitled to the payments. The requirements that are germane to this inquiry are: (1) Petitioner had to slaughter or export the dairy cows, and (2) petitioner could not use or permit others to use the farm for dairy operations for a period of 5 years.

It is also noted that the payments were to be measured by petitioner's milk production during a predetermined period of time. Petitioner bid a dollar amount which was multiplied by

the number of hundredweights of production for the pre-
scribed period. The Government's purpose in pursuing the
DTP was to reduce milk production by paying dairy farmers
to refrain from producing milk and to reduce the number of
domestic dairy animals. The DTP was part of a larger body
of legislation concerning milk support payments and related
dairy industry subsidies. See Food Security Act of 1985, Pub.
L. 99-198, 99 Stat. 1354, 1362.

Respondent, in Notice 87-26, *supra,* and on brief, concedes
that the portion of the payments received from the Govern-
ment that represents the difference between the amount peti-
tioner received for selling the animals for slaughter or export
and their fair market value as dairy animals would be cap-
ital gain to the extent that the payments were not a return
of capital. Due to respondent's concession, we accept without
discussion the character of that portion of the payments
received from the Government.

With respect to the remainder of the payments received
from the Government, we hold that they represent ordinary
income and are not payments in exchange for a capital asset,
intangible or otherwise. We base this decision on several
considerations. First, petitioner did not give up his goodwill
or know-how with respect to the operation of a dairy farm.
Admittedly, petitioner's equipment and dairy farm imple-
ments may have deteriorated, but he continues to possess
them. Second, petitioner did not sell the animals to the
Government; instead, he agreed to have them slaughtered or
exported. It must be emphasized that petitioner did not agree
to forever cease dairy farming, instead he agreed not to be
a dairy farmer or allow the farm to be used for dairy farming
purposes for 5 years. After 5 years petitioner could resume
dairy farming without any restriction under the DTP.
Additionally, petitioner did not give up the use of the farm
and he continued to use it for raising cattle (presumably beef
cattle).

In essence, petitioners argue that petitioner husband sold
the right to produce milk to the Government. Conversely,
petitioners contend that the right to produce milk was not
sold to the slaughter houses. We do not agree with this
characterization because it ignores reality. The Government
did not purchase the right to produce milk. Instead, the
Government agreed to pay petitioner to not produce milk and

to dispose of the source of his milk production (dairy herd). That is the reality of the agreement in this case. The payments received are no different from those received under a subsidy or support program under which a farmer is paid to leave a field fallow or to not produce a particular crop. The Government's payments were in exchange for petitioner's forbearance from dairy production for a period of years. But for any statutory exemption from taxation,[10] such payments represent ordinary income. Petitioners have not shown (nor do they argue) that this income is exempt and, accordingly, we hold that to the extent basis is exceeded, the amount received from the Government under the DTP program is ordinary income, except to the extent that the Government has conceded the difference between the slaughter/export price and fair market value may be taxed as capital gain.

A similar conclusion was reached by the Court of Appeals for the Eighth Circuit involving a bankruptcy case. *Bank of North Arkansas v. Owens,* 884 F.2d 330 (8th Cir. 1989). In that case, the court was considering whether the payments owed to the debtor under the DTP were from the sale of cattle, which were collateral under which a secured creditor sought to obtain payment of the debtor's obligation. In affirming the district and bankruptcy courts, the appellate court concluded "that the dairy payments do not constitute proceeds from the sale of cattle, but instead 'are based on contract rights having origin in the statutory and regulatory fabric of the [Dairy Termination Program] * * *.' [*In re*] *Kingsley,* 865 F.2d [975] at 980 [(8th Cir. 1989)]; see also *Rainier Nat'l Bank v. Bachmann,* 111 Wash. 2d 298, 311, 757 P.2d 979, 986 (1988) (Dore, J., dissenting)." *Bank of North Arkansas v. Owens, supra* at 333. Although, arguably, the contract right in this case could have been a capital asset, we have found otherwise. Having decided this case on "the realities", it is not necessary to consider the analogous or theoretical approaches argued by the parties.

---

[10] See, for example, sec. 126 exempting certain "cost-sharing payments" from income and secs. 102 and 1032. The payments under the DTP are not exempted under the Internal Revenue Code or the Food Security Act of 1985, Pub. L. 99-198, 99 Stat. 1354.

*Obsolescence or Abandonment of Their Dairy Parlor, Manure Pit, and Dairy Equipment*

The final issue concerns whether petitioners are entitled to deductions for obsolescence or abandonment of the building, equipment and manure pit which had been used in the dairy operation. This issue is a natural consequence of petitioner's agreement not to operate a dairy farm under the DTP. Petitioners argue that the cessation of use of the various dairy structures and equipment either constitutes an abnormal retirement of depreciable assets under section 1.167(a)-8(a)(3), Income Tax Regs., or an abandonment under section 165. Respondent argues that petitioner did not have the requisite (irrevocable) intent to abandon or never again use the equipment. We agree with respondent.

Section 1.167(a)-8(a)(3), Income Tax Regs., provides:

> Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account), gain will not be recognized. In such a case loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater * * *

Section 1.167(a)-8(a), Income Tax Regs., however, first requires "the *permanent withdrawal of depreciable property* from use in the trade or business or in the production of income." (Emphasis supplied.) The section goes on to provide that selling or abandoning of an asset is an example of permanent withdrawal.

Petitioners do not contend that petitioner husband sold the property in question; instead, their contention is that the property was abandoned, even though petitioners continue in ownership and possession. To be entitled to deduct an abandonment loss under section 165, a taxpayer must show: (1) An intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment. *United States v. S.S. White Dental Manufacturing Co.,* 274 U.S. 398 (1927); *A.J. Industries, Inc. v. United States,* 503 F.2d 660, 670 (9th Cir. 1974); *Citron v. Commissioner,* 97 T.C. 200, 208-209 (1991); *CRST, Inc. v. Commissioner,* 92 T.C. 1249, 1257 (1989), affd. 909 F.2d 1146 (8th Cir. 1990).

In determining a taxpayer's intent to abandon, the "subjective judgment of the taxpayer * * * as to whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer." *A.J. Industries, Inc. v. United States, supra* at 670. Non-use of assets alone, however, is insufficient to constitute the act of abandonment. *A.J. Industries, Inc. v. United States, supra* at 670, 677; *Jones Beach Theatre Corp. v. Commissioner,* T.C. Memo. 1966-100. The intent to abandon or discard the asset must be irrevocable. Sec. 1.167(a)-8(a)(4), Income Tax Regs.

Petitioner's testimony was honest and credible. On direct examination he was asked whether he had "any anticipation in 1986 that * * * [he] would ever want to go back into the dairy farm business?" In response, petitioner stated "That could have been in the back of my mind, yes." On redirect examination petitioner was asked again whether at the time he "sold off * * * [his] herd, did * * * [he] intend to use the milking parlor and the manure pit in the future." Petitioner stated "At the time we sold off, in the back of my mind, possibly the thought was there that, yeah, someday we might return." There is little question about petitioner's intention at the time of filing the 1986 tax return—he had not completely or irrevocably intended to abandon the assets because of the possibility that he might return to dairy farming.

Petitioner also testified and now argues that at the time of trial, when the 5-year limitation on dairy farming had already expired, he did not intend to reenter dairy farming because of prevailing milk prices and possibly because of the deteriorated condition of the fixtures and equipment. This argument misses the point because a taxpayer's intent is determined at the time the abandonment is claimed. Further, even though the milking equipment may have been in poor condition, the dairy parlor was part of the barn complex which, except for the dairy parlor portion, was in continuous use during the period under consideration. Also, the manure pit is a concrete structure and is not likely to have deteriorated to a point where it would be unusable should petitioners finally decide to begin dairy farming after 1986.

In view of the foregoing, we hold that petitioners have not shown the requisite intent, as of 1986, to abandon the assets

and are not entitled to a deduction or loss for abnormal retirement or abandonment for the 1986 taxable year.

To reflect the foregoing,

*Decision will be entered for respondent.*