CHARLES H. DE COU AND MARTHA M. DE COU, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11226–91.          Filed July 27, 1994.

*Farley P. Katz, Michael W. Stukenberg,* and *Kenton E. McDonald,* for petitioners.

*Deborah H. Delgado,* for respondent.

SWIFT, *Judge:* Respondent determined a deficiency of $25,675 in petitioners' joint Federal income tax for 1985. The issue for decision is whether petitioners are entitled to an ordinary loss deduction under sections 165(a) and 167 with respect to losses associated with a building demolished in 1985.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioners resided in Corpus Christi, Texas.

Since 1970, petitioner Charles H. De Cou (petitioner) has invested in real property located in or near Corpus Christi, Texas. Petitioner has also purchased, developed, leased, and sold both residential and commercial real property.

During the early 1980s, petitioner purchased seven adjoining parcels of real property located in a commercial block in downtown Corpus Christi, Texas. The seven adjoining parcels

were part of an area known as the Water Street Market. At the time petitioner purchased these parcels, four parcels were being used as parking lots, commercial buildings had been constructed on two of the parcels, and one parcel was unimproved. One of the buildings was vacant, and the other building was vacated shortly after petitioner purchased the parcels.

After consulting with an architect, petitioner decided to renovate the two buildings into space suitable for lease to restaurants and specialty shops and to build a plaza on the unimproved parcel. After completing renovations on the two buildings, petitioner leased space in the buildings to several businesses, the most successful of which have been two seafood restaurants.

In early 1984, petitioner negotiated with Dr. Miguel Pro for the purchase of two additional contiguous improved parcels of real property (the Pro parcel) that adjoined the seven parcels mentioned above that petitioner already had purchased in the Water Street Market. Located on the Pro parcel was a three-building complex. These three buildings shared a common foundation. At the time of purchase, the building at the east end of the Pro parcel (the Sonja building) was operated by the lessee thereof as a topless bar. The middle building (referred to as "the Hole in the Wall") was vacant. The building at the west end of the Pro parcel (the Neptune building) was also operated by the lessee thereof as a topless bar.

Prior to the purchase of the Pro parcel, petitioner and petitioner's architect and real estate broker inspected the three buildings located on the Pro parcel. The purpose of the inspection was to make general observations as to the potential renovation of the three buildings for incorporation into the Water Street Market, which was petitioner's intent with regard to buildings on the Pro parcel. No conditions or limitations that would preclude the economical renovation of the buildings were observed by petitioner or his architect or real estate broker, and Dr. Pro was unaware of any structural defects in any of the buildings.

On March 27, 1984, petitioner purchased from Dr. Pro the Pro parcel and the three buildings located thereon for $402,500. Petitioner allocated $91,045 of the purchase price to the Neptune building.

At the time of petitioner's purchase of the Pro parcel, the lessee of the Sonja building was paying rent of $850 per month, and the lessee of the Neptune building was paying rent of $1,500 per month. Under the terms of the leases, the lessees were responsible for maintaining and repairing the interior of these two buildings.

In 1984, shortly after petitioner purchased the Pro parcel, the lease of the Sonja building expired. Petitioner offered to renew the lease at a higher rate (approximately $1,150 per month), but the lessee of the Sonja building did not renew the lease. Petitioner then hired an architect and a Corpus Christi construction firm to plan renovations of the Sonja building and of the Hole in the Wall. The initial estimated cost of renovating the Sonja building and the Hole in the Wall was between $20 and $30 per square foot. Later in 1984, renovations of the Sonja building and of the Hole in the Wall were begun.

The Neptune building was subject to a long-term lease, and petitioner made no plans in 1984 for renovating the Neptune building.

On February 7, 1985, an inspector with the City of Corpus Christi Department of Health and Welfare performed a routine food service inspection of the topless bar located in the Neptune building. The inspector noted that the floor of the Neptune building was badly deteriorated, and he gave the lessee of the Neptune building 90 days to repair the floor.

During March and early April of 1985, the construction company renovating the Sonja building and the Hole in the Wall found major but hidden structural defects in those buildings. Leaks in the plumbing had caused raw sewage and water to collect underneath those buildings. The wooden portion of the foundation in the Hole in the Wall was severely rotted, and the load-bearing wall shared by the Hole in the Wall and the Neptune building was sagging.

Further investigation of the Neptune building identified additional defects in the floor, water leaks in the roof, and shorts in the electrical system.

In early April of 1985, petitioner notified the lessee of the Neptune building of the structural, electrical, and plumbing defects that had been discovered, of the danger posed by such defects to the public patronizing the Neptune building and to

the workers involved in renovating the adjacent buildings, and of the urgent need to repair the defects.

On or about April 12, 1985, the lessee of the Neptune building placed plywood decking and new carpet over portions of the floor of the Neptune building.

On April 15, 1985, concerned that the lessee was not taking adequate steps to repair the electrical defects in the Neptune building and that he might have some liability for repairs or for the failure to repair the Neptune building, petitioner notified the City of Corpus Christi of the Neptune building's hazardous condition.

On the morning of April 16, 1985, three inspectors from the City of Corpus Christi Building Inspection Department inspected the Neptune building. Later that morning, the chief building inspector notified petitioner that the inspectors had found serious building code violations and that the Neptune building's defects appeared to be extensive.

In the afternoon of April 16, 1985, petitioner notified the lessee of the Neptune building of the results of the inspection by the city building inspectors and that petitioner would arrange to repair the roof of the Neptune building, but that the lessee was responsible to repair the interior of the building. Petitioner emphasized the need to perform all of the repairs as soon as possible.

Between April 17, 1985, and April 23, 1985, petitioner hired a construction engineer, a plumber, and an architect to further inspect the Neptune building. Petitioner was advised by these professionals that the Neptune building's defects were extensive, that the full extent of the building's defects could only be ascertained by tearing up the floors, walls, and ceilings to expose the defective areas, that to repair the Neptune building, the existing interior would have to be almost completely torn down and rebuilt, and that the plywood decking recently installed by the lessee in a portion of the Neptune building was merely a temporary step and that it would actually accelerate further deterioration of the floor.

The damage to the Neptune building apparently was caused primarily by previously undetected plumbing leaks under the subflooring that had caused the foundation to shift and crack, in turn causing the load-bearing walls and ceiling joists to shift and crack.

Petitioner was advised that the likely cost of repairing the Neptune building would range from $75 per square foot to $100 per square foot (or a total of $300,000 to $400,000). Petitioner was also advised that the cost to construct on the same parcel of real property a new building of similar size was approximately $50 per square foot (or a total of $200,000).

On April 24, 1985, the City of Corpus Christi Department of Public Health and Welfare gave petitioner 7 days to correct the Neptune building's violations of the city's plumbing code.

In a letter of April 25, 1985, petitioner informed the lessee and the chief building inspector of the City of Corpus Christi that petitioner could not afford to repair the Neptune building. Petitioner also disclaimed any liability for any injury or damage that might occur as a result of the condition of the Neptune building.

On April 29, 1985, the health permit for the Neptune building was suspended by the City of Corpus Christi Department of Public Health and Welfare. The lessee agreed to close and cease operating the topless bar until the Neptune building was satisfactorily repaired. The lessee did not, however, make any subsequent repairs to the Neptune building, and the topless bar did not reopen.

On May 31, 1985, the Neptune building was inspected by the City of Corpus Christi Housing and Community Development Agency, and petitioner was informed that satisfactory repair of the Neptune building would cost more than 50 percent of the building's value, that all repairs of the building would be treated as new construction, and that as a result the entire building would have to conform to local building code and zoning ordinances.

On June 11, 1985, after negotiations and by agreement, the remaining term of the lease of the Neptune building was terminated. The lessee and petitioner agreed to release each other from any claims regarding the lease of the Neptune building. As part of the agreement, petitioner paid $22,500 to the lessee to buy out the lessee.

After the lessee vacated the Neptune building, petitioner boarded up the building with the intention that the Neptune building would no longer be used. Petitioner did not attempt to sell or donate the Neptune building.

Petitioner was informed that the Neptune building could not be insured if the building was left unoccupied, and petitioner decided to have the building demolished rather than remain exposed to the uninsurable risk of continued ownership of the building.

On October 31, 1985, at a cost of $17,655 to petitioner, the Neptune building was demolished and removed. On petitioner's books and records, the $17,655 cost of demolition and removal was added to petitioner's tax basis in the parcel of real property on which the Neptune building was situated. As of the date of trial, no building had been constructed on that parcel.

On their 1985 joint Federal income tax return, petitioners claimed an ordinary abandonment or retirement loss deduction in the amount of petitioner's adjusted tax basis in the Neptune building (namely, $85,987).

On audit of petitioners' 1985 joint Federal income tax return, respondent disallowed the claimed loss deduction.

OPINION

The retirement of depreciable business property from use in a trade or business or from use in the production of income may entitle a taxpayer to a loss deduction under section 165 and/or section 167. The retirement will so qualify if, for example, the property is abandoned or if an abnormal retirement of the property occurs. *J.B.N. Telephone Co. v. United States,* 638 F.2d 227, 230 (10th Cir. 1981); *Coors Porcelain Co. v. Commissioner,* 52 T.C. 682, 688–692 (1969), affd. 429 F.2d 1 (10th Cir. 1970); sec. 1.167(a)–8, Income Tax Regs. To establish that an abandonment of business property has occurred, both the taxpayer's intent to abandon the property and an affirmative act of abandonment must be established. *Standley v. Commissioner,* 99 T.C. 259, 271 (1992), affd. without published opinion 24 F.3d 249 (9th Cir. 1994); sec. 1.167(a)–8(a)(4), Income Tax Regs.; see also *United States v. S.S. White Dental Manufacturing Co.,* 274 U.S. 398, 402–403 (1927).

Generally, to establish that an abnormal retirement of business property has occurred, it must be established that the property has been permanently withdrawn from use in the taxpayer's business as a result of damage relating to a

casualty or that the property has suddenly lost its usefulness in the taxpayer's business as the result of "extraordinary obsolescence". Sec. 1.167(a)–8(b), Income Tax Regs; see, e.g., *Coors Porcelain Co. v. Commissioner, supra* at 693; *Dell v. Commissioner,* T.C. Memo. 1985–246; *Scott v. Commissioner,* T.C. Memo. 1979–29; *Gorman v. Commissioner,* T.C. Memo. 1974–18; see also sec. 1.167(a)–8, Income Tax Regs.

The amount of a loss realized from an abnormal retirement equals the adjusted tax basis of the property reduced by the greater of either the salvage value or the fair market value of the property. Sec. 1.167(a)–8(a)(3), Income Tax Regs.

Under section 280B, as amended by the Deficit Reduction Act of 1984, Pub. L. 98–369, sec. 1063(a), 98 Stat. 494, 1047, losses sustained "on account of" the demolition of any business property are not allowable.[1] *Tonawanda Coke Corp. v. Commissioner,* 95 T.C. 124, 128 n.2 (1990). Section 280B has not been interpreted in any regulation or published court opinion.

Respondent, however, in I.R.S. Notice 90–21, 1990–1 C.B. 332, discussed the application of section 280B. In that notice, respondent explained that for purposes of section 280B—

If a casualty damages or destroys a structure, and the structure is then demolished, the basis of the structure must be reduced by the casualty loss allowable under section 165 before the [nonallowable] "loss sustained on account of" the demolition is determined. [I.R.S. Notice 90–21, 1990–1 C.B. at 333.]

As I.R.S. Notice 90–21 implies, a loss sustained before a building's demolition (as a result, for example, of a building's abnormal retirement from a taxpayer's business because of a casualty to or an extraordinary obsolescence of the building) will not be treated as having been sustained "on account of"

---

[1] Sec. 280B was originally enacted in 1976 as part of the Tax Reform Act of 1976, Pub. L. 94–455, sec. 2124, 90 Stat. 1520, 1918, to help preserve "certified historic structures" by disallowing deductions for the expenses of demolishing such structures and for losses incurred as a result of the demolition. H. Rept. 94–1515, at 504 (1976). As indicated, in 1984 sec. 280B was amended to disallow deductions for the expenses of demolishing any business property.

Sec. 280B, as amended, provides in part as follows:

SEC. 280B(a). In the case of the demolition of any structure—

(1) no deduction otherwise allowable under this chapter shall be allowed to the owner or lessee of such structure for—

(A) any amount expended for such demolition, or

(B) any loss sustained on account of such demolition; and

(2) amounts described in paragraph (1) shall be treated as properly chargeable to capital account with respect to the land on which the demolished structure was located.

the demolition of the building, and such loss will therefore not be disallowed under section 280B. In construing section 280B, the words "on account of" should be construed in their ordinary sense to mean "by reason of" or "because of". Webster's Third New International Dictionary (1981); see *Crane v. Commissioner*, 331 U.S. 1, 6 (1947); *Laglia v. Commissioner*, 88 T.C. 894, 900 (1987).

Petitioners argue that before the Neptune building was demolished in October of 1985, the Neptune building, in April of 1985, suddenly lost its usefulness and became obsolete, and was, in June of 1985, abnormally retired and permanently withdrawn from use in petitioner's business, that the Neptune building had no fair market value or salvage value at the time it was withdrawn from use, and that, under sections 165(a) and 167, petitioners are entitled to an ordinary loss deduction for 1985 in the amount of $85,987, the amount of petitioners' adjusted tax basis in the Neptune building at the time it was withdrawn from use.

Respondent concedes that the Neptune building was permanently withdrawn from use in petitioners' business during 1985 and that, at that time, petitioners' adjusted tax basis in the Neptune building was $85,987. Respondent, however, argues that petitioners are not entitled to a loss deduction with respect to the Neptune building because the Neptune building allegedly was not the subject of a casualty or extraordinary obsolescence, and petitioner's loss should merely be regarded, under section 280B, as a nondeductible cost of demolishing the building.

We agree with petitioners. Although the extensive deterioration of the Neptune building may have occurred over the course of several years, in April of 1985, the Neptune building's usefulness in petitioner's business suddenly and unexpectedly terminated when the deterioration and defects in the flooring, foundation, roof, and electrical system were first discovered and when the building's health permit was suspended. The lessee could not thereafter operate a business in the building, and the health permit could not be reinstated unless the lessee or petitioner made repairs to the Neptune building that would have cost more than construction of a new building. In June of 1985, the Neptune building was permanently withdrawn from use in petitioner's business.

The withdrawal of the Neptune building from use in petitioner's business constituted an abnormal retirement that was caused by the unexpected and extraordinary obsolescence of the building. See *Coors Porcelain Co. v. Commissioner,* 52 T.C. 682, 693 (1969), affd. 429 F.2d 1 (10th Cir. 1970); *Gorman v. Commissioner,* T.C. Memo. 1974–18; see also sec. 1.167(a)–8(a)(3) and (b), Income Tax Regs.

The evidence also indicates and we conclude that, in June of 1985, the Neptune building's salvage value and fair market value were both zero. Therefore, the amount of the loss sustained by petitioner upon the abnormal retirement of the Neptune building was $85,987, the full amount of petitioner's adjusted tax basis in the building.

Respondent alleges that the concerns of the building inspectors with regard to the condition of the Neptune building were rigged, that petitioner intended to force the lessee to abandon its lease (thereby eliminating from the Water Street Market area an offensive topless bar), and that the Neptune building lost its usefulness in April of 1985 only because petitioner, as part of a purported scheme, notified representatives of the City of Corpus Christi of the condition of the Neptune building. Respondent argues that taxpayers should not be entitled to loss deductions under section 165 or 167 where they willfully damage their own property or where property is damaged as a result of the taxpayer's gross negligence. See *Blackman v. Commissioner,* 88 T.C. 677, 681–682 (1987), affd. without published opinion 867 F.2d 605 (1st Cir. 1988); *White v. Commissioner,* 48 T.C. 430, 435 (1967); *Heyn v. Commissioner,* 46 T.C. 302, 308 (1966).

Respondent has not presented the Court with any evidence to support her allegations. We found petitioner to be forthright and credible, and we conclude that petitioner did not willfully attempt to render the Neptune building useless by notifying appropriate authorities of the condition of the building. We conclude that petitioner's efforts to protect the public from injury and himself from liability were reasonable and prudent and did not constitute gross negligence.

Deductions disallowed under section 280B include only amounts "sustained on account of" the demolition of the building. The $17,655 expended for the demolition of the Neptune building was properly charged to the capital account with respect to the land on which the Neptune building was

located. The amount of the loss petitioner sustained, in October of 1985, on "account of" the demolition of the Neptune building, and therefore disallowed under section 280B, is limited, in this case, to petitioner's adjusted tax basis in the building at the time of its demolition. See H. Rept. 94–1515, at 504 (1976); I.R.S. Notice 90–21, 1990–1 C.B. 332, 333.

Petitioner's adjusted tax basis in the Neptune building had previously been reduced to zero as a result of the building's abnormal retirement in June of 1985, and no further loss was sustained by petitioner on account of the demolition of the Neptune building in October of 1985, beyond the $17,655 in direct demolition costs.

Respondent attempts to distinguish the facts of this case from those in I.R.S. Notice 90–21, *supra,* on the ground that the retirement of the Neptune building was not caused by a casualty. Section 1.167(a)–8(b), Income Tax Regs., however, is clear that damage caused by a casualty is just one example of an abnormal retirement.

Respondent argues further that if taxpayers are allowed to claim that they sustained an abnormal retirement loss with respect to a building shortly before the building was demolished, taxpayers routinely will be able to circumvent the disallowance provision of section 280B for demolition expenses. We disagree. Taxpayers who claim abnormal retirement losses must still establish that the claimed loss arose from the sudden, unexpected termination of the usefulness of the property (as through a casualty or extraordinary obsolescence). See sec. 1.167(a)–8, Income Tax Regs.

Based on our findings and conclusions herein, petitioners are entitled under section 165 and/or section 167 to ·an ordinary loss deduction for 1985 in the amount of $85,987 with respect to the abnormal retirement of the Neptune building.

*Decision will be entered for petitioners.*