T.C. Memo. 2012-289

UNITED STATES TAX COURT

BRIEN C. BLAKENEY AND PAMELA A. HALL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8366-09.                                   Filed October 15, 2012.

<u>Harris Hastings Barnes III</u> and <u>James G. McGee, Jr.</u>, for petitioners.

<u>Marshall R. Jones</u> and <u>John W. Sheffield III</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a $632,846 deficiency in

petitioners' Federal income tax for 2006.  The issue for decision is whether

petitioners' 68-foot Convertible Viking Yacht meets the definition of "qualified

[*2] Gulf Opportunity Zone property" under section 1400N(d)(2).[1] Petitioners resided in Flowood, Mississippi, at the time the petition was filed.

FINDINGS OF FACT

Brien C. Blakeney (petitioner) owns and operates two businesses, B&B Electrical Utilities Contractors and Island Time, LLC, a charter fishing operation. He started the charter fishing business in 1999, and it is based in Orange Beach, Alabama, a city on the Gulf of Mexico. Orange Beach is in Baldwin County, Alabama, which is in the Gulf Opportunity Zone (GO Zone).[2]

The Orange Beach fishing season runs from early May to early September. To attract fish petitioner placed artificial reefs in the Gulf of Mexico 20 to 40 miles offshore, and this is where his chartered boats would take customers to do

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue.

[2] In August 2005 Hurricane Katrina hit the gulf coast, causing massive devastation. The GO Zone covers the portion of the Hurricane Katrina disaster area determined by Federal Emergency Management Agency to be eligible for assistance from the Federal Government. The GO Zone includes various counties or parishes in Alabama, Louisiana, and Mississippi. In December 2005 Congress passed the Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, 119 Stat. 2577, to provide tax relief and incentives for individuals and businesses in the GO Zone. See also sec. 1400N.

[*3] most of their fishing. Petitioner avoided fishing closer to shore because these fishing spots were known to the public and he considered them overfished.[3]

On November 5, 2005, petitioner entered into a contract with Galati Yachts to purchase for $3,907,043 a 68-foot Convertible Viking Yacht to be used in his charter fishing business. Petitioner took possession of the boat, which he christened the Shockwave, on February 10, 2006, in Palm Beach, Florida,[4] and this is the date the parties stipulate that the Shockwave was placed in service for purposes of section 1400N(d)(2). Because of the continuous mechanical problems and malfunctions discussed below, the Shockwave did not arrive in Orange Beach until October 2006.

Difficulties in Getting to Orange Beach

Once petitioner took possession of the Shockwave in mid-February, he and Mark Enos, the Shockwave's captain, took the Shockwave on a "shakedown cruise".[5] A shakedown cruise is the initial trip(s) the new owner takes with the intention of discovering deficiencies in the boat that the service center can repair

---

[3] Only petitioner knew the geographic coordinates of his artificial reefs.

[4] Palm Beach, Florida, is not in the GO Zone. The distance from Palm Beach, Florida, to Orange Beach, Alabama, is around 800 to 1,000 nautical miles.

[5] Petitioner also chartered the Shockwave during the shakedown cruise. See infra p. 9.

**[*4]** before the owner takes the boat to its permanent location. The terms of Viking Yachts' warranty provided that, in most cases, repairs had to be done at Viking South,[6] so petitioner planned on keeping the Shockwave close to Viking South in case any problems arose during the shakedown cruise. Petitioner needed to make any repairs to the Shockwave before it headed to Orange Beach because Hurricane Katrina had destroyed the boat repair shops from New Orleans, Louisiana, to Pensacola, Florida.

For the shakedown cruise petitioner chose to go to the Bahamas because they are close to Viking South[7] and because if there were any problems that prevented the Shockwave from returning to Viking South there were boat repair facilities in Nassau, Bahamas. Shortly after the Shockwave left Viking South on its shakedown cruise it developed major mechanical problems that prevented Captain Enos from delivering the boat to Orange Beach.

Around February 21, 2006, less than two weeks after petitioner took possession, the Shockwave suffered its first of many mechanical problems. Water

---

[6] Viking Yachts has two main facilities, one near Palm Beach, Florida (Viking South), where petitioner took possession of the Shockwave, and one in New Jersey (Viking North). Viking South prepares the purchased boats before their owners take possession, and it has a service center that handles major repairs.

[7] The Bahamas are approximately 40 miles off the coast of Florida.

**[\*5]** was entering the fuel supply, causing engine problems and preventing the

Shockwave from running.[8]  Because the Shockwave was unable to return to Viking

South in Palm Beach for repairs, Viking Yachts sent technicians to Nassau.  The

Shockwave was forced to remain in Nassau for about a month while the problems

were fixed and the water was removed from the fuel supply.

On March 27, 2006, about one and a half months after petitioner took

possession, the Shockwave's electrical system, "the computerized brains" of the

boat, stopped working.[9]  The problems with the electrical system continued through

April 2006.  After repairs were performed on the Shockwave's electrical system, the

Shockwave left the Bahamas to continue its shakedown cruise and headed towards

the U.S. Virgin Islands to determine whether the repairs made were effective.[10]

---

[8]  The Shockwave's refrigeration system, washing machine, and dryer also
needed to be repaired.

[9]  The electrical system is responsible for alerting the captain if water enters
the bilge and for monitoring the temperature in the engine room, and it is connected
to the fire alarm system.

[10]  Boat repairs require a lot of trial and error.  Once a repair is made, the
boat's captain needs to determine whether the repair fixed the problem without
causing the occurrence of a different problem.  Often a repair may seem to be
effective in calm water, but once the water turns choppy the problem may reappear.

**[*6]**   In mid-May 2006 as the <u>Shockwave</u> was nearing St. Thomas, U.S. Virgin Islands, its generators began to fail.  The generators are responsible for charging the boat's batteries, and once the generators begin to fail the boat's batteries are quickly depleted and cause the boat to become inoperable.  Also around this time the <u>Shockwave</u>'s air conditioning and refrigeration systems required repairs, and this caused problems with its computer system, which needed cool temperatures to operate properly.  Additionally, the system that cooled the engines required repairs.  This prevented the <u>Shockwave</u> from reaching its cruising speed.  All of these problems prevented the <u>Shockwave</u> from leaving St. Thomas and traveling to Orange Beach at that time.

The boat was moored at Leverick Bay Marina in St. Thomas for repairs to the batteries.  On July 2, 2006, Captain Enos woke up to find the <u>Shockwave</u> sinking because of a hole in the boat.  Water had entered the engine room, and Captain Enos alerted those he could of the emergency, including the dockmaster.  While several men assisted with pumping water out of the engine room, Captain Enos donned diving gear and dove into the water to plug the hole.  Captain Enos was able to insert a temporary plug that stopped the boat from taking on additional water.

**[*7]** For repairmen to permanently fix the leak at the bottom of the <u>Shockwave</u>, the boat had to be hauled out of the water. Leverick Bay Marina was incapable of hauling out a 68-foot boat, so the <u>Shockwave</u> had to go to All Points Marina, also in St. Thomas.[11] While the boat was being repaired, the marina's technicians caused additional damage to the boat. Repairmen caused problems with the <u>Shockwave</u>'s main engine and electronics when they left its battery charger off overnight, and they also damaged its control panel while attempting to give it onshore power.[12]

On or around September 13, 2006, the <u>Shockwave</u> again experienced problems with its fuel and cooling systems. Viking Yachts instructed petitioner to take the boat from the U.S. Virgin Islands to Puerto Rico for repairs.[13] Sometime

---

[11] It is not clear whether a Viking Yachts technician supervised the repairs as they took place in the Virgin Islands or whether Viking Yachts instructed Captain Enos where to take the <u>Shockwave</u> to have it repaired. An incident report prepared by Captain Enos and Viking Yachts shows that Viking Yachts was aware of the situation and wanted the <u>Shockwave</u> hauled out of the water and supplied with power and water.

[12] Captain Enos had a technician at the marina sign a document stating that the marina's technicians were at fault for causing the problems that occurred after the <u>Shockwave</u> had been hauled out. When the control boards were ruined, Viking Yachts shipped new ones to St. Thomas.

[13] Puerto Rico is 50 or 60 miles from St. Thomas.

**[\*8]** in late September the repairs were completed and petitioner was told the Shockwave could make the trip to Orange Beach.[14]

In September 2006 Captain Enos unexpectedly passed away. Because petitioner did not feel qualified to captain the Shockwave from Puerto Rico to Orange Beach, he contacted Viking Yachts, which recommended he hire Captain Mike Stine to deliver it to Orange Beach. Petitioner hired Captain Stine and paid him a deposit of $5,000 on September 20, 2006, with the remainder of his fees to be paid upon delivery. Captain Stine flew to Puerto Rico and captained the Shockwave from Puerto Rico to Anna Maria, Florida, where it underwent additional repairs. From there Captain Stine captained it to Orange Beach. The Shockwave arrived in Orange Beach in October 2006.[15] The exact date of arrival is unclear, but petitioner paid Captain Stine the remainder of his fees and expenses, $9,173, on October 19, 2006. The Shockwave remained in Orange

---

[14] It is unclear exactly when the repairs were finished, but an incident report dated September 18, 2006, shows that the Shockwave was still experiencing problems.

[15] When the Shockwave arrived in Orange Beach, it first docked in a slip owned by Galati Yachts in Orange Beach Marina. Galati Yachts allowed petitioner to use its slip free of charge because of all the difficulties petitioner had experienced with the Shockwave. On November 29, 2006, the Shockwave moved to a slip at Orange Beach Marina leased by petitioner.

[*9] Beach for the rest of the year and was available for charter. However, because fishing season had ended, no customers chartered it.

Chartered Fishing Excursions

From February to late September 2006 the Shockwave was in the Caribbean conducting its shakedown cruise and undergoing repairs. On five occasions during those months, petitioner chartered it for fishing trips in the Caribbean. Petitioner chartered it in attempts to offset its repair costs and the revenue it was losing by not being in Orange Beach. Petitioner would schedule the trips between repairs, which was difficult to do because he did not know when the repairs were going to be made. During these fishing trips the Shockwave could not reach cruising speed or go more than five miles from the shoreline. However, the fishing conditions in the Caribbean are such that it did not need to travel more than a few miles from the shoreline.

While conducting the shakedown cruise, petitioner chartered the Shockwave to B&B Electrical Co. from February 13 to 22. B&B Electrical Co. chartered it to celebrate some of its employees' 20-year anniversary with the company.[16] From April 28 to May 5 B&B Electrical Co. chartered the Shockwave to take selected

_____

[16] It was common for B&B Electrical Co. to purchase charter days from Island Time, LLC, to entertain its customers, vendors, and employees.

[*10] customers on a fishing trip. From June 19 to 26 B&B Electrical Co. chartered it to take the company's vendors fishing. From July 9 to 18 petitioners chartered it as a gift to their parents. Petitioner and his brothers traveled to St. Thomas for a business trip and chartered the Shockwave from August 12 to 18.

Tax Return

On petitioners' Schedule C, Profit or Loss From Business, for Island Time, LLC, which they attached to their 2006 Form 1040, U.S. Individual Income Tax Return, they reported $212,776 of gross receipts and a $2,171,882 depreciation expense. Of the $2,171,882 depreciation expense, all of which related to the Shockwave, $1,974,438 was attributable to the bonus depreciation allowance for GO Zone property placed in service during 2006. Respondent determined that the Shockwave did not qualify as GO Zone property and therefore petitioners were not entitled to the bonus depreciation for GO Zone property.

OPINION

Shortly after Hurricane Katrina hit the gulf coast region Congress enacted section 1400N to provide relief and tax benefits to those in the GO Zone. See 151 Cong. Rec. H11152-02 (daily ed. Dec. 7, 2005) (statement of Rep. James McCrery of Louisiana) ("It is the point of this bill, to give people an extra reason, a little extra incentive to put that capital in these devastated areas to rebuild those

[*11] areas."). Section 1400N(d)(1)(A) provides that in the case of any qualified GO Zone property the depreciation deduction provided by section 167(a) for the taxable year in which such property is placed in service shall include an allowance equal to 50% of the adjusted basis of such property. Under section 1400N(d)(2)(A), the term "qualified Gulf Opportunity Zone Property" means property--

> (i) (I) which is described in section 168(k)(2)(A)(i), or
>
> (II) which is nonresidential real property or residential rental property,
>
> (ii) substantially all of the use of which is in the Gulf Opportunity Zone and is in the active conduct of a trade or business by the taxpayer in such Zone,
>
> (iii) the original use of which in the Gulf Opportunity Zone commences with the taxpayer on or after August 28, 2005,
>
> (iv) which is acquired by the taxpayer by purchase (as defined in section 179(d)) on or after August 28, 2005, but only if no written binding contract for the acquisition was in effect before August 28, 2005, and
>
> (v) which is placed in service by the taxpayer on or before December 31, 2007 (December 31, 2008, in the case of nonresidential real property and residential real property).

The issue before us is whether the Shockwave satisfies the second of the five requirements, i.e., whether substantially all of the Shockwave's use was in the

[*12] GO Zone and was in the active conduct of petitioner's trade or business in the GO Zone.[17]  Specifically, the parties disagree over what constitutes "use" in clause (ii) for purposes of determining whether substantially all of it occurred in the GO Zone.[18]  Petitioners argue that for property to be used by the taxpayer within the meaning of clause (ii), it must first be in condition to serve its intended purpose. Because the Shockwave's mechanical problems caused it to be under almost constant repair and prevented it from traveling farther than a few miles offshore, petitioners contend that the Shockwave was not used until it arrived in Orange Beach and could be used as intended (i.e., to travel 20 to 40 miles offshore). Respondent argues that it was used every day after petitioner took possession; thus, substantially all of the Shockwave's use occurred in the Caribbean and not in the GO Zone.

Generally, words in a statute must be interpreted according to their everyday, ordinary meaning.  See, e.g., Commissioner v. Soliman, 506 U.S. 168,

---

[17]  Respondent agrees that:  (1) the Shockwave is property described in sec. 168(k)(2)(A)(i); (2) the original use of the Shockwave in the GO Zone commenced with petitioners on or after August 28, 2005; (3) petitioner acquired the Shockwave on or after August 28, 2005; and (4) petitioner placed the Shockwave into service on or before December 31, 2007.

[18]  Respondent agrees that the Shockwave was used in the active conduct of petitioner's trade or business and that the trade or business was in the GO Zone.

[*13] 174 (1993). "Use", when used as a verb, as it is in section 1400N(d)(2)(A)(ii), means, inter alia, "to put into action or service; avail oneself of". Merriam Webster's Collegiate Dictionary 1301 (10th ed. 1996).

First, we must decide whether the Shockwave was used in the GO Zone and, if so, for how many days. The Shockwave arrived in Orange Beach, Alabama, no later than October 19, 2006,[19] and remained there for the rest of the year. During this time the Shockwave was available for charter, but no one chartered it.[20] Although the Shockwave was not chartered during this time, we find it was used for the purposes of section 1400N(d)(2)(A)(ii). By making it available for charter, petitioner placed it into service or action and availed himself of it. Thus, the Shockwave was used in the GO Zone for 74 days.

Next we must decide for how many days the Shockwave was used outside the GO Zone. Petitioners argue the Shockwave was not used at all while it was in the Caribbean because it was under constant repair and not fit for the purpose for which it was purchased. We agree with petitioners that the Shockwave was not used when it was so broken that it was unable to leave the dock (e.g., when there

---

[19] It is unclear from the record when the Shockwave arrived in the GO Zone, but we assume it was no later than October 19, 2006, when petitioner paid Captain Stine the remainder of his fee that was due on delivery.

[20] The Orange Beach fishing season ended in September.

**[*14]** was a hole in it or it had no power). However, on at least five occasions, for a total of 43 days, the <u>Shockwave</u> was chartered while in the Caribbean. Although the <u>Shockwave</u> was unfit for its intended purpose during these charters,[21] petitioner was able to charter it for multiple fishing trips, each lasting 8 to 10 days. Furthermore, petitioner earned more than $200,000 while chartering it in the Caribbean. We find that petitioner put the <u>Shockwave</u> in action or service and availed himself of it while it was in the Caribbean. Thus, petitioner used the <u>Shockwave</u> for at least 43 days while in the Caribbean. To decide otherwise would apply a definition to the word "use" at odds with its everyday, ordinary meaning.

When deciding how many days the <u>Shockwave</u> was used in the Caribbean, we must also include the days the <u>Shockwave</u> was available for charter. We cannot tell from the record whether there were days while the <u>Shockwave</u> was in the Caribbean that it was not chartered but was available for charter. It seems unlikely that the 43 days the <u>Shockwave</u> was actually chartered in the Caribbean were the only days that it was available for charter. Although we cannot

---

[21] The <u>Shockwave</u> was unable to go more than a few miles offshore and could not travel above an idling speed.

**[\*15]** determine the exact number of days the <u>Shockwave</u> was used in the Caribbean, we  know it was used a minimum of 43 days outside the GO Zone.[22]

Finally, we must decide whether "substantially all" of the <u>Shockwave</u>'s use occurred in the GO Zone when it was used 74 days in the GO Zone and at least 43 days outside the GO Zone.  Neither the Code nor the regulations define "substantially all" for the purposes of section 1400N.  Respondent argues that under Notice 2006-77, 2006-2 C.B. 590, "substantially all" of the <u>Shockwave</u>'s use was not in the GO Zone.  Notice 2006-77, <u>supra</u>, provides that for the purposes of section 1400N(d)(2)(A)(ii) "substantially all" means 80% or more.  <u>Id.</u> sec. 3.01, 2006-2 C.B. at 590.

Internal Revenue Service notices do not carry the force of law, <u>see</u> <u>Standley v. Commissioner</u>, 99 T.C. 259, 267 n.8 (1992), <u>aff'd without published opinion</u>, 24 F.3d 249 (9th Cir. 1994), and are therefore not accorded deference under <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843-844 (1984), <u>see</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001).  Although they may be entitled to deference under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), <u>see</u> <u>Mead</u>

---

[22]  Because, as discussed <u>infra</u> p. 16, we find "substantially all" use of the <u>Shockwave</u> did not occur in the GO Zone when it was used for 43 days outside the GO Zone, it does not matter whether there were additional days the <u>Shockwave</u> was used outside the GO Zone.

**[*16]** <u>Corp.</u>, 533 U.S. 218, we need not decide whether Notice 2006-77, <u>supra</u>, should be given <u>Skidmore</u> deference. We are able to conclude that "substantially all" of the <u>Shockwave</u>'s use did not occur in the GO Zone, without deciding whether we need to adopt Notice 2006-77, <u>supra</u>.

Of the days the <u>Shockwave</u> was used, no more than 63% were in the GO Zone.[23] We are unable to say "substantially all" of the <u>Shockwave</u>'s use occurred in the GO Zone when more than one-third of its use occurred outside the GO Zone. Because we conclude 63% is not "substantially all" we do not need to decide whether the 80% test adopted by Notice 2006-77, <u>supra</u>, is correct.

Because substantially all of the <u>Shockwave</u>'s use did not occur in the GO Zone, it is not GO Zone property. Thus, petitioners are not entitled to the bonus depreciation allowed under section 1400N(d).

In reaching our holding herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

---

[23] The <u>Shockwave</u> was used for a total of at least 117 days (at least 43 days outside the GO Zone and 74 days inside the GO Zone); thus, 74 days inside the GO Zone of 117 total days used is 63%.

**[\*17]** To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.